Timothy Randell
Name
PO Box 1989
ELY NV 89301

Prison Number

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
***

Timothy Randell                    ,
                        Plaintiff

vs.

(1) LUKE PRENGAMAN              ,
(2) MAIZIE PUSICH               ,

                               ,
                               ,
                               ,
                        Defendant(s).

Case No. _____
     (Supplied by Clerk of Court)

## CIVIL RIGHTS COMPLAINT
## PURSUANT TO
## 42 U.S.C. § 1983

## A.      JURISDICTION

1)   This complaint alleges that the civil rights of Plaintiff, Timothy Randell      ,
                                        (print plaintiff's name)

who presently resides at ELY STATE PRISON            , were violated by

the actions of the below-named individuals that were directed against Plaintiff at

Washoe Co. Jail Reno Nevada        on    the    following    dates:
(institution/city where violation occurred)

December 22, 2016               , and _____.
   (Claim 1)              (Claim 2)              (Claim 3)

**Make a copy of this page to provide the below
information if you are naming more than five (5) defendants**

2)   Defendant _LUKE PRENGAMAN_ resides at _P.O. Box 30083   Reno NV_ , and is
(full name of first defendant)                    (address of first defendant)

employed  as _Ass' DISTRICT ATTORNEY_ . This defendant is sued in his/her
(defendant's position and title, if any)

_X_ individual _X_ official capacity. (Check one or both.) Explain how this defendant was acting

under color of law: _DIRECTLY Responsible to MAKE SURE SENTENCES_
_ARE WITHIN STATUTORY LIMITS._

3)   Defendant _MAIZIE PUSICH_ resides at _350 S. CENTER ST.   Reno, NV_ , and is

employed  as _Asst PUBLIC DEFENDER_ . This defendant is sued in · his/her

_X_ individual _X_ official capacity. (Check one or both.) Explain how this defendant was acting

under color of law: _DIRECTLY Responsible To ensure her CLIENTS Rights_
_ARE Protected and Sentence within STATUTORY Limits._

4)   Defendant _____ resides at _____ , and is

employed  as _____ . This defendant is sued in his/her

___ individual ___ official capacity. (Check one or both.) Explain how this defendant was acting

under color of law: _____

_____

2

5) Defendant _____ resides at _____, and is
employed as _____. This defendant is sued in his/her
___ individual ___ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _____

_____

6) Defendant _____ resides at _____, and is
employed as _____. This defendant is sued in his/her
___ individual ___ official capacity. (Check one or both.) Explain how this defendant was acting
under color of law: _____

_____

7) Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. If you wish to
assert jurisdiction under different or additional statutes, list them below.

_____

_____

**B.     NATURE OF THE CASE**

8) Briefly state the background of your case.

We shall PROVE THAT Defendants one and Two Allowed MR Randell
To be Sentenced To Life in prison without paRole on A Charge of Sexual
Assult with A Deadly Weapon even though STATUTE STATES The Maximum
Sentence is 10yrs To Life. Further we shall PROVE By Exhibits THAT
MR Randell WAS told when he entered his Plea THAT The Maximum
Sentence WAS 10yrs to Life. Violations of 5th 6th 8th & 14th Amendments

## C.   CAUSE(S) OF ACTION

### CLAIM 1

The following civil rights have been violated: _MR Randell's Right TO DUE PROCESS OF LAW WAS VIOLATED IN The Following Way._

Supporting Facts: [Include all facts you consider important.  State the facts clearly, in your own words, and without citing legal authority or argument.  Be sure you describe exactly what each specific defendant (by name) did to violate your rights].

DUE PROCESS OF LAW IS The total, SUPPOSED ORDERLY process in which OUR Legal System WORKS. EACH person has The ABSOLUTE Right to DUE Process/of Law). FOR DUE Process The LAW MUST Be Based on ABSOLUTE TRUTH and it Must be ADJUDICATED IN A fair and EQUAL WAY. IN This Case We Can PROVE That MR Randell DID NOT IN any Way Receive DUE PRocess. We shall USE COURT TRANSCRipts to prove this Beyond any DOUBT. Neither Defendant Can Claim immunity As their ACTIONS WERE IN NO WAY OF A JUDICIAL NATURE AND ARE IN NO WAY BASED ON LAW. We will FIRST Refer the COURT TO EXHIBIT ONE which is MR. Randell's TRIAL TRANSCRipts from October 19, 2016 entitled MOTION TO Confirm TRIAL. We Refer the Court TO page 16 Lines 17-21. HERE The Defendant #1 Tells MR Randell That The possible Sentence AS TO COUNT III SEXUAL ASSULT WITH USE Of A DEADLY WEAPON IS LIFE IN prison WITH the possibility of parole After 10 years ARE SERVED. We Now Refer you to EXHIBIT TWO which IS DATED OCTOBER 19, 2016 and is Entitled Guilty plea Memorandum. We Refer you

4

## B. NATURE OF THE CASE

Briefly state, in numbered paragraphs, the background facts of your case (you may attach additional

pages, in necessary) : CLAIM ONE CONTINUED

TO page 9 Lines 18-22. HERE MR Randell IS TOLD IN his Guilty plea AgReement THAT he MUST Be Sentenced to Life with the possibility of parole. AfteR 10 years ARE SERVED. We then RefeR you to page 13, heRe We find THAT MR Randell, DefendanT ONE and DefendanT #2 Signed this AgReement. Now We Come to the horrific VIolATioN. We Refer the CourT to EXHIBIT THREE which is DATED December 22, 2016 and is entitled Sentencing. We RefeR the CourT TO page 53 Lines 5-8. HERE Even though Being told that the CRIme of Sexual ASSULT with Use OF A DEADLY Weapon ResulTED IN THAT he MUST Be Sentenced to Life with possibility of parole After 10 years ARE SERVED; After Signing A Guilty plea Membrandum which STATED the Same Sentence he is Now Sentenced to Life in prison with No possibility of parole. This IS A CLEAR VIolATioN OF Due Process OF LAW. DefendanT ONE WAS the Source of infoRmATioN from the STATE TO MR Randell and DefendanT #2 WAS his Supposed ADVOCATE who Allowed this To happen withouT OBJection Clearly NoT ACTING AS AN ADVOCATE

**CLAIM 2**

The following civil rights have been violated: MR Randells Right TO EQUAL Protection under the LAW was Violated IN the following Way.

Supporting Facts: [Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be sure you describe exactly what each specific defendant (by name) did to violate your rights].

FIRST WE INCORPORATE All ACCUSATIONS FROM CLAIM ONE INTO CLAIM TWO IN THAT These ACTIONS NOT only Violated Due Process But Also EQUAL Protection. The EQUAL protection UNDER The LAW Amendment IS A GUARANTEE That The LAWS OF This Nation WERE DESIGNED TO Protect EVERY person and Also That The LAW BE APPlIED EQUAlly. Noone has Authority TO pick and Choose Which LAWS Apply to which people. That IS The purpose Behind EQUAL protection with Both WORDS having huge Meaning, EQUAL and protection. We Again Refer the Court TO Exhibit Two page 9 lines 18-22. This is the Guilty plea Memorandum and it STATES MR Randall Must Be Sentenced to A TERM OF LiFe with parole Eligability After 10 years. Now please Refer to page 13 Where Both Defendants Signed the Agreement. Now We have A Legal Document Filed in the Court Guaranteeing MR Randell of his Sentence Should he plead Guilty. The purpose of A GUILTY plea AGREEMENT IS TO Afford EQUAL protection. Now We Refer to the Sentencing TRANSCRIPTS DATED

**B. NATURE OF THE CASE**

Briefly state, in numbered paragraphs, the background facts of your case (you may attach additional

pages, in necessary) : CLAIM TWO CONTINUED

December 22, 2016. We Refer you to page 53
Lines 5-8. HERE MR Randell is Sentenced to Life
without Parole which VIOLATES the Guilty plea Memorandum
and is Beyond NEVADA STATUTE. This ALONE VIOLATES
EQUAL PROTECTION. We now Refer you to page 5
Lines 8-10 of EXHIBIT THREE. HERE Defendant # TWO
STATES to the Court THAT Even though MR Randell
is Charged WITH Serious Sexual CRIMES that
Absolutely Require A PsychoSexual EVALUATION, She
has gained Most of her psychological information
from MR Randells Brother! This is A VIOLATION OF
EQUAL protection As MR Randell has DOCumented
Psychiatric history Since Age 9. We now Refer
to page 9 Lines 14-16 Where Again Defendant TWO
STATES THAT Most of the Medical information She
has Came from MR Randells Brother. This is
incredable and VIOLATES MR Randells Right to
EQUAL protection. HE WAS Facing Life Sentences
WITH 18 years of psychiatric history including
hospitalization and his Defense Counsel uses
information OBTAINED From MR Randells Brother.
Shameful.

## CLAIM 3

The following civil rights have been violated: MR Randell's Right Against
Cruel and Unusual Punishment WAS VIOLATED IN the
Following Way.

Supporting Facts: [Include all facts you consider important. State the facts clearly, in
your own words, and without citing legal authority or argument. Be sure you describe
exactly what each specific defendant (by name) did to violate your rights].

This is A VERY Short ARGUMENT. We Refer the Court to
EXHIBIT ONE ANNAS page 16 Lines 17-21. EXHIBIT TWO
page 9 Lines 18-22 and finally EXHIBIT THREE lines.
page 53 Lines 5-8, HERE we find THAT MR Randell
WAS Deceived by promises of one Sentence, entering A
Plea and then Receiving A Sentence of Life without parole
Which is A DeFacto Death Sentence. This Sentence VIOLATES
EXHIBITS ONE and TWO AS Well AS NevADA STATUTE.
The Sentence is CRUEL and Unusual and this Court MUST
intervine. The Defendants CAN NOT IN any Way Claim
immunity As their ACTIONS Were Deceptive, IN violation
of their Sworn office

6

9)   Have you filed other actions in state or federal courts involving the **same or similar facts** as involved in this action? Circle one: Yes or No. If your answer is "Yes," describe each lawsuit. (If more than one, describe the others on an additional page answering the following questions.)

   a)   Defendants: _____

   b)   Name of court and docket number: _____

   c)   Disposition (for example, was the case dismissed, appealed or is it still pending?):

        _____

   d)   Issues raised: _____

        _____

        _____

   e)   Approximate date it was filed: _____

   f)   Approximate date of disposition: _____

10)  Have you filed an action in federal court that was dismissed because it was determined to be frivolous, malicious, or failed to state a claim upon which relief could be granted? Circle one: Yes or No. If your answer is "Yes," describe each lawsuit. (If you had more than three actions dismissed based on the above reasons, describe the others on an additional page answering the following questions.)

   **Lawsuit #1 dismissed as frivolous, malicious, or failed to state a claim:**

   a)   Defendants: _____

   b)   Name of court and case number: _____

   c)   The case was dismissed because it was found to be (circle one): (1) frivolous;

        (2) malicious; or (3) failed to state a claim upon which relief could be granted.

   d)   Issues raised: _____

        _____

        _____

   e)   Approximate date it was filed: _____

   f)   Approximate date of disposition: _____

7

**Lawsuit #2 dismissed as frivolous, malicious, or failed to state a claim:**

a)      Defendants: _____

b)      Name of court and case number: _____

c)      The case was dismissed because it was found to be (circle one): (1) frivolous;

        (2) malicious;  or (3) failed to state a claim upon which relief could be granted.

d)      Issues raised: _____

        _____

        _____

e)      Approximate date it was filed: _____

f)      Approximate date of disposition: _____

**Lawsuit #3 dismissed as frivolous, malicious, or failed to state a claim:**

a)      Defendants: _____

b)      Name of court and case number: _____

c)      The case was dismissed because it was found to be (circle one): (1) frivolous;

        (2) malicious;  or (3) failed to state a claim upon which relief could be granted.

d)      Issues raised: _____

        _____

        _____

e)      Approximate date it was filed: _____

f)      Approximate date of disposition: _____

### D.    REQUEST FOR RELIEF

I believe I am entitled to the following relief: _Punitive Damages of_
_$1,000,000.00 and AN ORDER TO 2ND Judicial Court_
_TO VACATE SENTENCE_

I understand that a false statement or answer to any question in this complaint will subject me to penalties of perjury. **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.** *See* 28 U.S.C. § 1746 and 18 U.S.C. § 1621.

_____          X _Timothy Randell_
(name of person who prepared or helped              (signature of plaintiff)
prepare this complaint if not the plaintiff)

_September 28, 2020_
(date)

9

EXHIBIT ONE

EXHIBIT

F I L E D
Electronically
CR15-1360
2016-12-27 11:05:26 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 5871992

1    4185

2    STEPHANIE KOETTING

*page 16*
*line 17 to 24*

3    CCR #207

4    75 COURT STREET

5    RENO, NEVADA

6

7                IN THE SECOND JUDICIAL DISTRICT COURT

8                  IN AND FOR THE COUNTY OF WASHOE

9            THE HONORABLE PATRICK FLANAGAN, DISTRICT JUDGE

10                           --oOo--

11   STATE OF NEVADA,              )
                                   )
12                Plaintiffs,      )
                                   )
13   vs.                          )     Case No. CR15-1360
                                   )
14   TIMOTHY RANDELL,              )     Department 7
                                   )
15                Defendant.       )
                                   )
16   _____)

17

18

19                  TRANSCRIPT OF PROCEEDINGS

20                   MOTION TO CONFIRM TRIAL

21                      October 19, 2016

22                        9:00 a.m.

23                       Reno, Nevada

24   Reported by:     STEPHANIE KOETTING, CCR #207, RPR
                       Computer-Aided Transcription

1  APPEARANCES:

2  For the State:

3                      OFFICE OF THE DISTRICT ATTORNEY
                       By:  LUKE PRENGAMAN, ESQ.
4                      P.O. Box 30083
                       Reno, Nevada
5

6  For the Defendant:

                       OFFICE OF THE PUBLIC DEFENDER
7                      By:  MAIZIE PUSICH, ESQ.
                       350 S. Center
8                      Reno, Nevada

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

025

```
 1                RENO, NEVADA, October 19, 2016, 9:00 a.m.

 2

 3                           --oOo--

 4                THE CLERK:  Case number CR15-1360, State versus

 5      Timothy Randell.  Matter set for motion to confirm trial.

 6      Counsel and the Division, please state your appearance.

 7                MS. DEROSA:  Patty Derosa for the Division.

 8                MS. PUSICH:  Maizie Pusich appearing with

 9      Mr. Randall, your Honor.

10                MR. PRENGAMAN:  Good morning, your Honor.  Luke

11      Prengaman for the State.

12                THE COURT:  Good morning, counsel.  Mr. Randell,

13      the State of Nevada has filed an amended information against

14      you, charging you with, Count One, attempted murder with the

15      use of a deadly weapon; Count Two, sexual assault with the

16      use of deadly weapon causing substantial bodily harm; Count

17      Three, sexual assault with the use of a deadly weapon; Count

18      Four, kidnapping in the first degree with the use of a deadly

19      weapon causing substantial bodily harm; and Count Five,

20      robbery with the use of deadly weapon.  Your attorney is

21      being provided a copy of the amended information.

22                Sir, I understand coming to court always makes

23      people a little nervous, but how do you feel here this

24      morning?
```

3

026

1              THE DEFENDANT:  I feel fine.

2              THE COURT:  Have you taken any medication in the

3     last 24 hours?

4              THE DEFENDANT:  Yes, I have.

5              THE COURT:  What have you taken?

6              THE DEFENDANT:  Zyprexa.

7              THE COURT:  Does it interfere with your ability to

8     understand?

9              THE DEFENDANT:  No.

10             THE COURT:  Have you had a chance to talk with

11    Ms. Pusich about what we're going to do here this morning?

12             THE DEFENDANT:  Yes, I have.

13             THE COURT:  Ms. Pusich.

14             MS. PUSICH:  Thank you, your Honor.  Mr. Randell's

15    name is correctly stated and spelled at line 13 of the

16    amended information.  We are familiar with its contents and

17    waive its formal reading.  Mr. Prengaman graciously provided

18    us a copy of this in advance of its filing this morning, so

19    we had a chance to review it before.

20             Your Honor, pursuant to negotiations, Mr. Randell

21    will enter pleas of guilty to all the charges filed in the

22    amended information.  Pursuant to negotiations, the State has

23    agreed it will not pursue any of the other charges originally

24    filed against Mr. Randell.  I believe Mr. Prengaman has

THEY SCARED ME I'M ADC DEATH PENALTY THIS IS MY FIRST
TIME IN PRISON I ONLY HAVE POSITION OF STOLEN
PROPERY ON MY RECORD SO I HAVE NO BAD BACKGROUND

1    combined what were six counts into what are now two and he's

2    agreed to dismiss the remainder.  Originally, Mr. Randell

3    faced 17.

4            At the time of sentencing, both parties will be

5    free to argue with respect to an appropriate sentence for all

6    of the charges.  Mr. Randell understands that the sentences

7    could be concurrent or consecutive to each other, but they

8    must be consecutive to the sentence he's currently serving.

9            Finally, your Honor, the State could have pursued

10   an enhancement of the sentences against Mr. Randell based on

11   his background, and pursuant to these negotiations, has

12   agreed not to do so.

13           THE COURT:  Mr. Prengaman.

14           MR. PRENGAMAN:  That's a correct statement, your

15   Honor.

16           THE COURT:  Mr. Randell, is that your

17   understanding of the negotiations?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Sir, by entering a plea of guilty,

20   you're waiving certain important constitutional rights.  I'll

21   explain these rights to you, and if you have any questions,

22   let me know, I'll give you a chance to talk with your

23   attorney.  Sir, by entering a plea of guilty here today,

24   you're waiving your right to a speedy and public jury trial.

1    If this case had gone to trial, there would have been 12

2    citizens.  They would have been sworn, seated in the box to

3    my left.  All 12 would have to reach a unanimous verdict

4    before you could be found guilty.  By entering a plea of

5    guilty, you're waiving that constitutional right.  Do you

6    understand that, sir?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  By entering a plea of guilty, you're

9    also waiving your right to cross examine witnesses against

10   you at that trial.  Those witnesses would have been sworn.

11   They would be seated in the box to my left.  You through your

12   attorney would have the ability to cross examine those

13   witnesses.  By entering a plea of guilty, you're waiving that

14   constitutional right.  Do you understand that, sir?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Also, by entering a plea of guilty,

17   you're waiving your right to compulsory process, which means

18   compelling the attendance of witnesses that may have

19   testimony in your favor at that trial.  That means if this

20   case had gone to trial, and if there were people you felt

21   could testify favorably for you, you through your attorney

22   could apply to the Court.  The Court would issue the subpoena

23   and compel the person to attend the proceedings.  By entering

24   a plea of guilty, you're waiving that constitutional right.

```
 1   Do you understand that, sir?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  Also, under the Fifth Amendment, you

 4   have the right to remain silent.  If this case had gone to

 5   trial, you would not be required to testify.  You would not

 6   be required to produce any evidence.  You could remain

 7   silent, seated at counsel table and rest on the presumption

 8   of innocence.  By pleading guilty, you're waiving that right,

 9   because I'll be asking you questions and you have to answer.

10   Do you understand that?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  Also, under the Sixth Amendment, you

13   have the right to the effective assistance of counsel at

14   trial.  By entering a plea of guilty here today, you're

15   waiving that right, because we're not going to have a trial,

16   although you'll still have the good services of Ms. Pusich

17   throughout the rest of these proceedings.  But do you

18   understand that entering a plea of guilty here today, you're

19   waiving that constitutional right?

20              THE DEFENDANT:  Yes, sir.

21              THE COURT:  Also by entering a plea of guilty here

22   today, you're relieving the State of its obligation to prove

23   each and every element of the offense beyond a reasonable

24   doubt.  By entering a plea of guilty, you're waiving that
```

1    constitutional right.  Do you understand that, sir?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Mr. Prengaman, if this case had gone

4    to trial, what would the State have been prepared to prove?

5            MR. PRENGAMAN:  Your Honor, as to Count One, Mr.

6    Randell, as to Count One, the State would be prepared to

7    prove beyond a reasonable doubt the elements of attempted

8    murder with the use of deadly weapon.  Those elements are

9    that you on or about June 17th to June 18th, 2015 in Washoe

10   County, Nevada, did willfully and unlawfully attempt to kill

11   Krystal S, Jose Ayala and Francisco Saldana, human beings, by

12   shooting at Jose Ayala with a firearm, the firearm

13   constituting a deadly weapon, by strangling Ayala with a wire

14   or other ligature, the wire or other ligature being used as a

15   deadly weapon, and by means of setting a fire in the

16   apartment in which Krystal S, Jose Ayala and Francisco

17   Saldana were bound and restrained, the fire being used as a

18   deadly weapon, at 2085 Cannan Street, apartment F, in Reno,

19   Washoe County, Nevada.

20           And that you and an unknown male did willfully and

21   unlawfully aid and abet each other and act as conspirators

22   with each other in committing the aforementioned acts in that

23   you and the unknown male did willfully, unlawfully counsel,

24   encourage and conspire and agree with each to kill Krystal S,

THERE WAS A FIRE IN THE APARTMENT IT WAS A PAN LEFT ON THE STOVE WIT THE STOVE ON BUT NO FIRE AT ALL AND I NEVER CHOKE AYALA HE SAID HIS SELF MY CODEFEN DENT DID

```
 1   Jose Ayala and Francisco Saldana, and in furtherance thereof,
 2   you shot at Jose Ayala with a firearm, you and/or the other
 3   male strangled Ayala with a wire or other ligature, and you
 4   and the unknown male together poured oil around the interior
 5   of the apartment and set a fire in the apartment.
 6           As to Count Two, the State would be prepared to
 7   prove beyond a reasonable doubt the elements of sexual
 8   assault with the use of a deadly weapon causing substantial
 9   bodily harm.  Those elements are that you on or about June
10   17th to June 18th, 2015, in Washoe County, Nevada, did
11   willfully and unlawfully subject Krystal S to sexual
12   penetration against her will in that you penetrated Krystal
13   S's mouth with your penis at 2085 Cannan Street, apartment F,
14   in Reno and did use a deadly weapon, which was a firearm, in
15   the commission of the offense, which you displayed to the
16   victim, pointed at the victim while threatening to kill her
17   and her boyfriend if she did not comply with your demands,
18   and you used to menace Krystal S before and during the
19   assault, and you and the unknown male did willfully,
20   unlawfully aid and abet each other and act as conspirators
21   with each other in committing the aforementioned acts in that
22   you and the unknown male did willfully, unlawfully counsel,
23   encourage and conspire and agree with each other to sexually
24   assault Krystal S, and in furtherance thereof, you and the
```

1   unknown male took Krystal S to the bathroom and forced her to

2   disrobe, you held her at gunpoint and threatened her, and you

3   and the unknown male took turns sexually penetrating

4   Krystal's mouth and substantial bodily did result to Krystal

5   S from the actions you committed in connection with or as a

6   part of the sexual assault, in that Krystal S suffered

7   substantial bodily injury which created a substantial risk of

8   death and prolonged physical pain to her throat and neck due

9   to you and the unknown male forcefully sexually penetrating

10  her mouth and due to the defendant or the unknown male

11  manually strangling her after sexually assaulting her in

12  order to cover up the crimes, and in that Krystal S suffered

13  prolonged physical pain due to you forcefully scrubbing her

14  vaginal area with a scrubber sponge after assaulting her in

15  order to cover up the crimes.

16         As to Count Three, the State would be prepared to

17  prove beyond a reasonable doubt the elements of sexual

18  assault with the use of deadly weapon.  Those elements are

19  that you on June 17th to June 18, 2015, in Washoe County,

20  Nevada, did willfully, unlawfully subject Krystal S to sexual

21  penetration against her will, in that you penetrated Krystal

22  S's vagina with your penis or with an unknown object at 2085

23  Cannan Street, apartment F, in Reno, and did use a deadly

24  weapon, which was a firearm, in the commission of the

THE VICTIM I ALWAYS WALKED TO THE BATH ROOM I DIDNT HAVE
TO DRAG HER ARE EUEN TOUCH HER I TOLD HER GO AND SHE
DID AND THE D.A. TRYD TO SAY IN THE PROCESS OF THE KID
NAP FROM HER GOIN FROM ONE ROOM TO THE NEXT SHE
SUFFERED SBH.. WHICH DID NOT HAPPEN

1    offense, which you displayed to the victim, pointed 'at the

2    victim while threatening to kill her and her boyfriend, if

3    she did not comply with your demands, and used to menace

4    Krystal S before and during the assaults, and you and an

5    unknown male did willfully and unlawfully aid and abet each

6    other and act as conspirators with each other in committing

7    the aforementioned acts in that you and the unknown male did

8    willfully and unlawfully counsel, encourage, conspire and

9    agree with each other to sexually assault Krystal S, and in

10   furtherance thereof, you and the unknown male took Krystal S

11   to the bathroom and forced her to disrobe, you held her at

12   gunpoint and threatened her, and you and the unknown male

13   took turns sexually assaulting Krystal's vagina.

14           As to Count Four, the State would be prepared to

15   prove beyond a reasonable doubt the elements of kidnapping in

16   the first degree with the use of a deadly weapon causing

17   substantial bodily harm.  Those elements are that you on

18   June 17th to June 18, 2015, within Washoe County, Nevada, did

19   willfully and unlawfully seize, confine, abduct, kidnap,

20   and/or carry away the person of Krystal S with the intent to

21   hold or detain Krystal S for the purpose of committing sexual

22   assault upon her, and did hold or detain Krystal S for the

23   purpose of committing sexual assault upon her, and did use a

24   deadly weapon, which was a firearm, in the commission of the



034

```
 1    offense which you displayed and pointed at the victim and

 2    used to menace and subdue Krystal S, and you and the unknown

 3    male did willfully and unlawfully aid and abet each other and

 4    act as conspirators with each other in committing the

 5    aforementioned acts in that you and the unknown male did

 6    willfully and unlawfully counsel, encourage and conspire and

 7    agree with each other to sexually assault Krystal S and to

 8    take Krystal S to a separate room in the apartment to

 9    sexually assault her, and in furtherance thereof, you and the

10    unknown male took Krystal S to a separate room, which was the

11    bathroom, with the intent to hold and detain her there for

12    the purpose of sexually assaulting her, and once in the

13    bathroom, you and the unknown male held and detained Krystal

14    S there at gunpoint for the purpose of sexually assaulting

15    her, and Krystal S suffered substantial bodily harm during

16    the act of the kidnapping or the subsequent detention and

17    confinement, in that Krystal S suffered substantial bodily --

18    I'm sorry -- suffered bodily injury, which created a

19    substantial risk of death and prolonged physical pain to her

20    throat and neck due to you and the unknown male forcibly

21    sexually penetrating her mouth, and due to you and the

22    unknown male manually strangling her after sexually

23    assaulting her in order to cover up the crimes, in that

24    Krystal S suffered prolonged physical pain due to you
```

THE DA SAID ABBA SBU BY SCABBOUT HER WIT A SPONGE HE TRYD TO MAKE IT SOUND LIKE IT HURT I WASHD HER WITH HER OWN BATH SPONGE THAT SHE USE EVERYDAY IS WHAT THE VICTIM SAID

1   forcefully scrubbing her vaginal area with a scrubber sponge

2   after assaulting her in order to cover up the crimes.

3              As to Count Five, the State would be prepared to

4   prove beyond a reasonable doubt the elements of robbery with

5   the use of deadly weapon.  The elements of that offense are

6   that you on June 17th to June 18, 2015, in Washoe County,

7   Nevada, did willfully and unlawfully take personal property,

8   to wit, a necklace from around Krystal S's neck, rings from

9   Krystal S's fingers and a necklace and bracelet from the

10  bedroom, from the person and in the presence of Krystal S,

11  did willfully and unlawfully take a Play Station game console

12  and Play Station games and a wallet/cell phone case and its

13  contents, including a debit card, in and from the person and

14  in the presence of Jose Ayala, and did willfully and

15  unlawfully take a wallet and its contents, including cash and

16  vehicle keys, from the person and in the presence of

17  Francisco Saldana, against their will and by means of force

18  or violence and fear of immediate or future injury to the

19  persons of Krystal S, Jose Ayala and Francisco Saldana and

20  with the use of a deadly weapon, which was a firearm, which

21  you displayed to the victims, fired and used to menace and

22  subdue Krystal S, Jose Ayala and Francisco Saldana, this

23  occurring at 2085 Cannan Street, apartment F, in Reno, and

24  you and the unknown male did willfully and unlawfully aid and

1  abet each other and act as conspirators with each other in

2  committing the aforementioned acts, in that you and the

3  unknown male did unlawfully counsel, encourage and conspire

4  and agree with each other to rob Krystal S, Jose Ayala and

5  Francisco Saldana, and in furtherance thereof, you held the

6  victims at gunpoint, you and the unknown male demanded money

7  and property, subdued and incapacitated Krystal S, Jose Ayala

8  and Francisco Saldana by threatening, pushing and biting

9  them, searched the victims' apartment for property to steal,

10  place stolen property into a duffel bag or other bag in order

11  to facilitate the robbery, took a necklace from around

12  Krystal S's neck, rings from Krystal S's fingers and took

13  Krystal S's necklace and bracelet from the bedroom, took Jose

14  Ayala's Play Station game console and Play Station games and

15  his wallet/cell phone case and its contents, including a

16  debit card, and took Francisco Saldana's wallet and its

17  contents, including cash and his vehicle keys, from the

18  victims' persons and in their presence against their will and

19  by means of force or violence and fear of immediate or future

20  injury to their persons.

21        THE COURT:  Now, sir, do you understand what the

22  maximum sentence is that may be imposed in each of these

23  cases?

24        THE DEFENDANT:  Yes, I do.

1            THE COURT:  As to Count One, attempted murder with
2    the use of a deadly weapon, what is it?
3            THE DEFENDANT:  Two to 20 years.
4            THE COURT:  As to Count Two, sexual assault with
5    use of a deadly weapon causing substantial bodily harm, what
6    is it?
7            THE DEFENDANT:  15 to life.
8            THE COURT:  As to Count Three, sexual assault with
9    the use of a deadly weapon, what is the maximum sentence?
10           THE DEFENDANT:  15 to life.
11           THE COURT:  As to Count Four, kidnapping in the
12   first degree with the use of a deadly weapon causing
13   substantial bodily harm, what is the maximum sentence?
14           THE DEFENDANT:  Life without.
15           THE COURT:  As to Count Five, robbery with the use
16   of a deadly weapon, what is the maximum sentence?
17           THE DEFENDANT:  Two to 15 years.
18           THE COURT:  Now, are any of these sentences
19   probationary?
20           THE DEFENDANT:  I believe not.
21           MS. PUSICH:  Your Honor, Count Three is actually
22   ten to life.  I believe he said it was 15.
23           THE COURT:  Mr. Prengaman.
24           MR. PRENGAMAN:  If I may, your Honor, I think

1   although he was close, if you will allow me to just make sure

2   that he understands the penalties for each.

3           Mr. Randell, as to Count One, do you understand

4   that the possible punishment for that offense is a minimum of

5   two years up to a maximum of 20 years in the Nevada State

6   Prison, as well as a consecutive additional sentence of a

7   minimum of one year up to a maximum of 20 years for the

8   deadly weapon enhancements?

9           THE DEFENDANT:  Yes.

10          MR. PRENGAMAN:  As to Count Two, you understand

11  that the maximum possible punishment for that count is a

12  sentence of either 15 to life or life without the possibility

13  of parole, plus an additional consecutive sentence of a

14  minimum of one year and up to a maximum of 20 years in prison

15  for the deadly weapon enhancement?

16          THE DEFENDANT:  Yes, sir.

17          MR. PRENGAMAN:  As to Count Three, do you

18  understand that the possible sentence for that offense is

19  that you must be imprisoned for a period of life with the

20  possibility of parole with eligibility for parole beginning

21  when a minimum of ten years has been served, and additionally

22  must serve a consecutive prison sentence of not less than one

23  year and a maximum of not more than 20 years for the deadly

24  weapon enhancement?

1          THE DEFENDANT:  Yes, sir.

2          MR. PRENGAMAN:  As to Count Four, do you

3     understand that the possible punishment for that offense is a

4     period of either life without the possibility of parole or

5     life with the possibility of parole with eligibility for

6     parole beginning when a minimum term of 15 years has been

7     served or a definite term of 40 years with eligibility for

8     parole beginning when a minimum term of 15 years has been

9     served, and that in addition to one of those three, you must

10    serve an additional consecutive sentence in prison of not

11    less than one year to a maximum of not more than 20 years for

12    the deadly weapon enhancement?

13         THE DEFENDANT:  Yes, sir.

14         MR. PRENGAMAN:  As to Count Five, do you

15    understand that the possible punishment for that crime is a

16    minimum of not less than two years and a maximum of not more

17    than 15 years in the Nevada State Prison, with an additional

18    consecutive term of not less than one year to a maximum of

19    not more than 15 years for the deadly weapon enhancement?

20         THE DEFENDANT:  Yes, sir.

21         MR. PRENGAMAN:  Do you understand as to Count One,

22    you are eligible for probation?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  As to Counts Two, Three, Four and

```
1    Five, do you understand you're not eligible for probation?

2              THE DEFENDANT:  Yes, sir.

3              MR. PRENGAMAN:  Do you understand as to Counts Two

4    and Three, the sexual assault counts, the Court must impose

5    as to those counts a special sentence of lifetime

6    supervision?

7              THE DEFENDANT:  Yes, sir.

8              MR. PRENGAMAN:  Do you also understand as to those

9    counts you would be required to register as a sex offender?

10             THE DEFENDANT:  Yes, sir.

11             MR. PRENGAMAN:  Thank you, your Honor.

12             THE COURT:  Sir, do you also understand that these

13   sentences can run concurrent or consecutive?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  In your own words, tell me what does

16   consecutive mean?

17             THE DEFENDANT:  Consecutive means you have to do

18   each sentence.  It don't count for all the sentences

19   together.

20             THE COURT:  You realize that they follow each

21   other?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And your understanding of the word

24   concurrent, what does that mean?
```

```
 1              THE DEFENDANT:  Concurrent means all the time
 2    count for the charge that you get charged with.
 3              THE COURT:  Okay.  Now, did you sign this guilty
 4    plea memorandum?
 5              THE DEFENDANT:  Yes, sir.
 6              THE COURT:  Did you read it?
 7              THE DEFENDANT:  Yes, sir.
 8              THE COURT:  Did you understand it?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  Did you speak to your attorney about
11    it?
12              THE DEFENDANT:  Yes, sir.
13              THE COURT:  Have you had enough time to talk with
14    Ms. Pusich about this case?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  Are you satisfied with the services
17    Ms. Pusich has provided to you?
18              THE DEFENDANT:  Yes, I am.
19              THE COURT:  Ms. Pusich, any question in your mind
20    of your client's competency to understand the nature of these
21    proceedings, enter a plea or assist counsel at trial?
22              THE DEFENDANT:  No, your Honor.
23              THE COURT:  Now, sir, you understand, although
24    you've made an agreement with the State, sentencing is in the
```

1   sole discretion of the Court.  As I sit here now, I don't

2   know what the sentence is going to be.  At the time of

3   sentencing, I'll listen to you, I'll listen to your attorney,

4   I'll listen to the State's attorney, I'll review and consider

5   all the information provided to me by the Division of Parole

6   and Probation.  But do you understand that sentencing is in

7   the sole discretion of the Court?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Now, other than that which is

10  contained in the plea agreement, has anybody promised you

11  anything or threatened you in order to induce you to plead

12  guilty here this afternoon?

13          THE DEFENDANT:  No, sir.

14          THE COURT:  Are you pleading guilty here freely

15  and voluntarily?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Tell me what happened?

18          THE DEFENDANT:  I harmed some innocent people.

19          THE COURT:  Did you commit the acts as outlined in

20  the amended information in this case?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Based upon everything we've done here

23  this morning, do you have any -- this afternoon, do you have

24  any questions of me of about these proceedings so far?

```
 1              THE DEFENDANT:  No, I do not.
 2              THE COURT:  All right.  Sir, as to Count One, what
 3    is your plea, guilty or not guilty?
 4              THE DEFENDANT:  Guilty.
 5              THE COURT:  As to Count Two, what is your plea,
 6    guilty or not guilty?
 7              THE DEFENDANT:  Guilty.
 8              THE COURT:  As to Count Three, what is your plea,
 9    guilty or not guilty?
10              THE DEFENDANT:  Guilty.
11              THE COURT:  As to Count Four, what is your plea,
12    guilty or not guilty?
13              THE DEFENDANT:  Guilty.
14              THE COURT:  As to Count Five, what is your plea,
15    guilty or not guilty?
16              THE DEFENDANT:  Guilty.
17              THE COURT:  The Court finds that the defendant
18    understands the nature of the offense charged, the
19    consequences of his pleas, has made a knowing, voluntary and
20    intelligent waiver of his constitutional rights.  The Court
21    will accept his pleas at this time.  Ms. Clerk, do we have a
22    date for sentencing?
23              THE CLERK:  Your Honor, do you want a special set?
24              THE COURT:  Mr. Prengaman, do you need a special
```

1  set?

2          MR. PRENGAMAN:  Yes, your Honor.  I think both

3  parties believe it will take some time.

4          THE CLERK:  Counsel, what do you think about

5  December 22nd, Thursday morning or afternoon?

6          MS. PUSICH:  Morning, please.

7          THE COURT:  Schedule it for December 22nd at

8  9:00 a.m..

9          THE COURT:  Sir, you're going to be given a packet

10  of material from the Division of Parole and Probation.  Fill

11  it out as completely as possible.  It's mostly biographical

12  information.  The more information the Court has about you,

13  the better job it will be able to do.  Do you have any

14  questions about what we've done here today?

15          THE DEFENDANT:  No, sir.

16          THE COURT:  Court's in recess.

17                          --oOo--

18

19

20

21

22

23

24

```
1   STATE OF NEVADA       )
                          ) ss.
2   County of Washoe      )

3        I, STEPHANIE KOETTING, a Certified Court Reporter of the

4   Second Judicial District Court of the State of Nevada, in and

5   for the County of Washoe, do hereby certify;

6        That I was present in Department No. 7 of the

7   above-entitled Court on October 19, 2016, at the hour of 9:00

8   a.m., and took verbatim stenotype notes of the proceedings

9   had upon the motion to confirm trial in the matter of THE

10  STATE OF NEVADA, Plaintiff, vs. TIMOTHY RANDELL, Defendant,

11  Case No. CR15-1360, and thereafter, by means of

12  computer-aided transcription, transcribed them into

13  typewriting as herein appears;

14       That the foregoing transcript, consisting of pages 1

15  through 23, both inclusive, contains a full, true and

16  complete transcript of my said stenotype notes, and is a

17  full, true and correct record of the proceedings had at said

18  time and place.

19

20       DATED:  At Reno, Nevada, this 27th day of December 2016.

21

22                         S/s Stephanie Koetting
                           STEPHANIE KOETTING, CCR #207
23

24
```

EXHIBIT TWO

EXHIBIT TWO

F I L E D
Electronically
CR15-1360
2016-10-19 02:49:28 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5766263

*page #9*
*Line 18 to 22*

```
 1   CODE 1785
     Christopher J. Hicks
 2   #7747
     P.O. Box 11130
 3   Reno, NV. 89520
     (775)328-3200
 4   Attorney for Plaintiff

 5

 6      IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA,

 7             IN AND FOR THE COUNTY OF WASHOE

 8                         *  *  *

 9   THE STATE OF NEVADA,

10                 Plaintiff,
                                        Case No. CR15-1360
11         v.
                                        Dept. No. 7
12   TIMOTHY RANDALL, also known as TIMOTHY RANDELL, also known as CHRIS
     JONES,
13
                 Defendant.
14   _____/

15                   GUILTY PLEA MEMORANDUM

16
         1.  I, TIMOTHY RANDALL, also known as TIMOTHY RANDELL, also
17
     known as CHRIS JONES, understand that I am charged with the
18
     offense(s) of:  COUNT I. ATTEMPTED MURDER WITH THE USE OF A DEADLY
19
     WEAPON, a violation of NRS 193.330, being an attempt to violate NRS
20
     200.010, and NRS 193.165, a category B felony (50031); COUNT II. SEXUAL
21
     ASSAULT WITH THE USE OF A DEADLY WEAPON CAUSING SUBSTANTIAL BODILY
22
     HARM, a violation of NRS 200.366(1), NRS 200.366(2), NRS 193.165, and
23
     NRS 0.060, a category A felony (50098); COUNT III. SEXUAL ASSAULT WITH
24
     THE USE OF A DEADLY WEAPON, a violation of NRS 200.366(1), NRS
25
     200.366(2), and NRS 193.165 a category A felony (50097); COUNT IV.
26
     KIDNAPPING IN THE FIRST DEGREE WITH THE USE OF A DEADLY WEAPON CAUSING
```

*you cant give The same enhancement for the same offence*

SUBSTANTIAL BODILY HARM, a violation of NRS 200.310(1), NRS 200.320 and NRS 193.165, a category A felony (50056); and COUNT V. ROBBERY WITH THE USE A DEADLY WEAPON, a violation of NRS 200.380 and NRS 193.165, a category B felony (50138).

2.   I desire to enter a plea of guilty to the offense(s) of COUNT I. ATTEMPTED MURDER WITH THE USE OF A DEADLY WEAPON, a violation of NRS 193.330, being an attempt to violate NRS 200.010, and NRS 193.165, a category B felony (50031); COUNT II. SEXUAL ASSAULT WITH THE USE OF A DEADLY WEAPON CAUSING SUBSTANTIAL BODILY HARM, a violation of NRS 200.366(1), NRS 200.366(2), NRS 193.165, and NRS 0.060, a category A felony (50098); COUNT III. SEXUAL ASSAULT WITH THE USE OF A DEADLY WEAPON, a violation of NRS 200.366(1), NRS 200.366(2), and NRS 193.165 a category A felony (50097); COUNT IV. KIDNAPPING IN THE FIRST DEGREE WITH THE USE OF A DEADLY WEAPON CAUSING SUBSTANTIAL BODILY HARM, a violation of NRS 200.310(1), NRS 200.320 and NRS 193.165, a category A felony (50056); and COUNT V. ROBBERY WITH THE USE A DEADLY WEAPON, a violation of NRS 200.380 and NRS 193.165, a category B felony (50138), as more fully alleged in the charge(s) filed against me.

3.   By entering my plea of guilty I know and understand that I am waiving the following constitutional rights:

A.   I waive my privilege against self-incrimination.

B.   I waive my right to trial by jury, at which trial the State would have to prove my guilt of all elements of the offenses beyond a reasonable doubt.

C.   I waive my right to confront my accusers, that is, the right to confront and cross examine all witnesses who would testify

at trial.

       D.  I waive my right to subpoena witnesses for trial on my behalf.

      4.  I understand the charge(s) against me and that the elements of the offense(s) which the State would have to prove beyond a reasonable doubt at trial are, as to Count I, that on June 17 to June 18, 2015, or thereabout, in the County of Washoe, State of Nevada, I did, willfully and unlawfully attempt to kill KRYSTAL S., JOSE AYALA, and FRANCISCO SALDANA, human beings, by shooting at JOSE AYALA with a firearm (the firearm constituting a deadly weapon); by strangling AYALA with a wire or other ligature (the wire or other ligature being used as a deadly weapon); and by means of setting a fire in the apartment in which KRYSTAL S., JOSE AYALA, and FRANCISCO SALDANA were bound and restrained (the fire being used as a deadly weapon), at 2085 Cannan Street, Apartment F, in Reno, Washoe County, Nevada; and

      I and an unknown male did willfully and unlawfully aid and abet each other and act as conspirators with each other in committing the aforementioned acts, in that I and the unknown male did willfully and unlawfully counsel, encourage, and conspire and agree with each other to kill KRYSTAL S., JOSE AYALA, and FRANCISCO SALDANA, and in furtherance thereof, I shot at JOSE AYALA with a firearm; I and/or the other male strangled AYALA with a wire or other ligature; and I and the unknown male together poured oil around the interior of the apartment and set a fire in the apartment.

///

3

1    As to Count II, I understand the charge and that the

2    elements of the offense which the State would have to prove beyond a

3    reasonable doubt at trial are that: On June 17 to June 18, 2015,

4    within the County of Washoe, State of Nevada, I did willfully and

5    unlawfully subject KRYSTAL S. to sexual penetration against her will,

6    in that I penetrated KRYSTAL S.'s mouth with my penis, at 2085 Cannan

7    Street, Apartment F, in Reno, Washoe County, Nevada, and did use a

8    deadly weapon, which was a firearm, in the commission of the offense,

9    which I displayed to the victim, pointed at the victim while

10   threatening to kill her and her boyfriend if she did not comply with my

11   demands, and used to menace KRYSTAL S. before and during the assault;

12   and

13   I and an unknown male did willfully and unlawfully aid and

14   abet each other and act as conspirators with each other in committing

15   the aforementioned acts, in that I and the unknown male did willfully

16   and unlawfully counsel, encourage, and conspire and agree with each

17   other to sexually assault KRYSTAL S., and in furtherance thereof, I

18   and the unknown male took KRYSTAL S. to the bathroom and forced her to

19   disrobe, I held her at gunpoint and threatened her, and I and the

20   unknown male took turns sexually penetrating Krystal's mouth; and

21   Substantial bodily harm did result to KRYSTAL S. from the

22   actions of me committed in connection with or as a part of

23   the sexual assault, in that KRYSTAL S. suffered bodily injury which

24   created a substantial risk of death and prolonged physical pain to her

25   throat and neck due to me and the unknown male forcibly sexually

26   penetrating her mouth and due to me or the unknown male manually

4

strangling her after sexually assaulting her in order to cover up the crimes; and in that KRYSTAL S. suffered prolonged physical pain due to me forcefully scrubbing her vaginal area with a scrubber sponge after assaulting her in order to cover up the crimes.

As to Count III, I understand the charge and that the elements of the offense which the State would have to prove beyond a reasonable doubt at trial are that: On June 17 to June 18, 2015, within the County of Washoe, State of Nevada, I did willfully and unlawfully subject KRYSTAL S. to sexual penetration against her will, in that the defendant penetrated KRYSTAL S.'s vagina with his penis or with an unknown object, at 2085 Cannan Street, Apartment F, in Reno, Washoe County, Nevada, and did use a deadly weapon, which was a firearm, in the commission of the offense, which I displayed to the victim, pointed at the victim while threatening to kill her and her boyfriend if she did not comply with my demands, and used to menace KRYSTAL S. before and during the assault; and

I and an unknown male did willfully and unlawfully aid and abet each other and act as conspirators with each other in committing the aforementioned acts, in that I and the unknown male did willfully and unlawfully counsel, encourage, and conspire and agree with each other to sexually assault KRYSTAL S., and in furtherance thereof, I and the unknown male took KRYSTAL S. to the bathroom and forced her to disrobe, I held her at gunpoint and threatened her, and I and the unknown male took turns sexually penetrating KRYSTAL's vagina.

As to Count IV, I understand the charge and that the elements of the offense which the State would have to prove beyond a

5

1  reasonable doubt at trial are that: On June 17 to June 18, 2015,

2  within the County of Washoe, State of Nevada, I did willfully and

3  unlawfully seize, confine, abduct, kidnap and/or carry away the person

4  of KRYSTAL S., with the intent to hold or detain KRYSTAL S. for the

5  purpose of committing sexual assault upon her, and did hold or detain

6  KRYSTAL S. for the purpose of committing sexual assault upon her, and

7  did use a deadly weapon, which was a firearm, in the commission of the

8  offense, which I displayed and pointed at the victim and used to menace

9  and subdue KRYSTAL S.; and

10        That I and an unknown male did willfully and unlawfully aid

11 and abet each other and act as conspirators with each other in

12 committing the aforementioned acts, in that I and the unknown male did

13 willfully and unlawfully counsel, encourage, and conspire and agree

14 with each other to sexually assault KRYSTAL S. and to take KRYSTAL S.

15 to a separate room in the apartment to sexually assault her, and in

16 furtherance thereof, I and the unknown male took KRYSTAL S. to a

17 separate room, which was the bathroom, with the intent to hold and

18 detain her there for the purpose of sexually assaulting her, and once

19 in the bathroom, I and the unknown male held and detained KRYSTAL S.

20 there at gunpoint for the purpose of sexually assaulting her; and

21        KRYSTAL S. suffered substantial bodily harm during the act of

22 kidnapping or the subsequent detention and confinement, in that KRYSTAL

23 S. suffered bodily injury which created a substantial risk of death and

24 prolonged physical pain to her throat and neck due to the me and the

25 unknown male forcibly sexually penetrating her mouth and due to me or

26 the unknown male manually strangling her after sexually assaulting her

6

1   in order to cover up the crimes; and in that KRYSTAL S. suffered

2   prolonged physical pain due to me forcefully scrubbing her vaginal area

3   with a scrubber sponge after assaulting her in order to cover up the

4   crimes.

5          As to Count V, I understand the charge and that the

6   elements of the offense which the State would have to prove beyond a

7   reasonable doubt at trial are that: On June 17 to June 18, 2015,

8   within the County of Washoe, State of Nevada, I did willfully and

9   unlawfully take personal property, to wit, a necklace from around

10  KRYSTAL S.'s neck, rings from KRYSTAL S.'s fingers, and a necklace and

11  bracelet from the bedroom, from the person and in the presence of

12  KRYSTAL S.; I did willfully and unlawfully take a PlayStation game

13  console and PlayStation games, and a wallet/cell phone case and its

14  contents including a debit card, from the person and in the presence of

15  JOSE AYALA; and I did willfully and unlawfully take a wallet and its

16  contents including cash, and vehicle keys, from the person and in the

17  presence of FRANCISCO SALDANA; against their will, and by means of

18  force or violence and fear of immediate or future injury to the persons

19  of KRYSTAL S., JOSE AYALA, and FRANCISCO SALDANA, and with the use of a

20  deadly weapon, which was a firearm, which I displayed to the victims,

21  fired, and used to menace and subdue KRYSTAL S., JOSE AYALA, and

22  FRANCISCO SALDANA, this occurring at 2085 Cannan Street, Apartment F,

23  in Reno, Washoe County, Nevada; and

24          I and an unknown male did willfully and unlawfully aid and

25  abet each other and act as conspirators with each other in committing

26  the aforementioned acts, in that I and the unknown male did willfully

7

1   and unlawfully counsel, encourage, and conspire and agree with each
2   other to rob KRYSTAL S., JOSE AYALA, and FRANCISCO SALDANA, and in
3   furtherance thereof, I held the victims at gunpoint, I and the unknown
4   male demanded money and property, subdued and incapacitated KRYSTAL S.,
5   JOSE AYALA, and FRANCISCO SALDANA by threatening, pushing, and binding
6   them, searched the victims' apartment for property to steal, placed
7   stolen property into a duffel bag or other bag in order to facilitate
8   the robbery, took a necklace from around KRYSTAL S.'s neck, rings from
9   KRYSTAL S.'s fingers, and took KRYSTAL S.'S necklace and bracelet from
10  the bedroom; took JOSE AYALA's PlayStation game console and PlayStation
11  games, and his wallet/cell phone case and its contents including a
12  debit card; and took FRANCISCO SALDANA's wallet and its contents
13  including cash, and his vehicle keys, from the victims' persons and in
14  their presence, against their will and by means of force or violence
15  and fear of immediate or future injury to their persons.

16      5.  I understand that I admit the facts which support all
17  the elements of the offenses by pleading guilty.  I admit that the
18  State possesses sufficient evidence which would result in my
19  convictions.  I have considered and discussed all possible defenses
20  and defense strategies with my counsel.  I understand that I have the
21  right to appeal from adverse rulings on pretrial motions only if the
22  State and the Court consent to my right to appeal in a separate
23  written agreement.  I understand that any substantive or procedural
24  pretrial issue(s) which could have been raised at trial are waived by
25  my pleas.

26  ///

1          6.   I understand that the consequences of my plea of

2   guilty, as to Count I, are that I may be imprisoned in the state

3   prison for a minimum term of not less than 2 years and a maximum term

4   of not more than 20 years, and that in addition I must be imprisoned

5   consecutively in the state prison for an additional minimum term of

6   not less than 1 year and a maximum term of not more than 20 years for

7   the deadly weapon enhancement. I understand that I am eligible for

8   probation as to Count I.

9          I further understand that the consequences of my plea of

10  guilty, as to Count II, are that I may be imprisoned in the state

11  prison either: (1) For life without the possibility of parole; or (2)

12  For life with the possibility of parole, with eligibility for parole

13  beginning when a minimum of 15 years has been served. I understand

14  that in addition I must be imprisoned consecutively in the state

15  prison for an additional minimum term of not less than 1 year and a

16  maximum term of not more than 20 years for the deadly weapon

17  enhancement, and that I am not eligible for probation on Count II.

18         I further understand that the consequences of my plea of

19  guilty, as to Count III, are that I must be imprisoned in the state

20  prison for a period for life with the possibility of parole, with

21  eligibility for parole beginning when a minimum of 10 years has been

22  served, and that in addition I must be imprisoned consecutively in

23  the state prison for an additional minimum term of not less than 1

24  year and a maximum term of not more than 20 years for the deadly

25  weapon enhancement. I understand that I am not eligible for probation

26  on Count III.

9

1         I further understand that the consequences of my plea of
2    guilty, as to Count IV, are that I may be imprisoned in the state
3    prison for a period of: (1) Life without the possibility of parole;
4    (2) Life with the possibility of parole, with eligibility for parole
5    beginning when a minimum term of 15 years has been served; or (3) A
6    definite term of 40 years, with eligibility for parole beginning when
7    a minimum term of 15 years has been served; and that in addition I
8    must be imprisoned consecutively in the state prison for an
9    additional minimum term of not less than 1 year and a maximum term of
10   not more than 20 years for the deadly weapon enhancement. I
11   understand that I am not eligible for probation on Count IV.

12        I further understand that the consequences of my plea of
13   guilty, as to Count V, are that I may be imprisoned in the state
14   prison for a period of a minimum term of not less than 2 years and a
15   maximum term of not more than 15 years in the Nevada State Department
16   of Corrections, and that in addition I must be imprisoned
17   consecutively in the state prison for an additional minimum term of
18   not less than 1 year and a maximum term of not more than 15 years for
19   the deadly weapon enhancement. I understand that I am not eligible
20   for probation on Count V.

21        I understand that the sentence on each count may be
22   concurrent or consecutive to each other. I further understand that as
23   to Counts II and III I must receive a special sentence of lifetime
24   supervision, which will commence after any period of probation or any
25   term of imprisonment and any period of release on parole, and that I
26   will also be required to register as a Sex Offender pursuant to NRS

176.0927.

7. In exchange for my pleas of guilty, the State, my counsel and I have agreed to recommend the following: The State and I will each be free to argue for an appropriate sentence. The State will not pursue any additional criminal charges or enhancements against me in this case.

8. I understand that, even though the State and I have reached this plea agreement, the State is reserving the right to present arguments, facts, and/or witnesses at sentencing in support of the plea agreement.

9. I also agree that I will make full restitution in this matter, as determined by the Court. Where applicable, I additionally understand and agree that I will be responsible for the repayment of any costs incurred by the State or County in securing my return to this jurisdiction.

10. I understand that the State, at their discretion, is entitled to either withdraw from this agreement and proceed with the prosecution of the original charges or be free to argue for an appropriate sentence at the time of sentencing if I fail to appear at any scheduled proceeding in this matter OR if prior to the date of my sentencing I am arrested in any jurisdiction for a violation of law OR if I have misrepresented my prior criminal history OR if I violate any of the terms of this agreement as set forth in Paragraph 7. I understand and agree that the occurrence of any of these acts constitutes a material breach of my plea agreement with the State. I represent that I do have a prior criminal record, including 2013

11

1   felony convictions for possession of stolen property and attempted

2   possession of stolen property.

3        11.  I understand and agree that pursuant to the terms of

4   the plea agreement stated herein, any counts which are to be

5   dismissed or not pursued, any counts included in the criminal

6   complaint, and any other cases charged or uncharged which are either

7   to be dismissed or not pursued by the State, may be considered by the

8   court at the time of my sentencing.

9        12.  I understand that the Court is not bound by the

10  agreement of the parties and that the matter of sentencing is to be

11  determined solely by the Court.  I have discussed the charges, the

12  facts and the possible defenses with my attorney.  All of the

13  foregoing rights, waiver of rights, elements, possible penalties, and

14  consequences, have been carefully explained to me by my attorney.  My

15  attorney has not promised me anything not mentioned in this plea

16  memorandum, and, in particular, my attorney has not promised that I

17  will get any specific sentence.  I am satisfied with my counsel's

18  advice and representation leading to this resolution of my case.  I

19  am aware that if I am not satisfied with my counsel I should advise

20  the Court at this time.  I believe that entering my pleas is in my

21  best interest and that going to trial is not in my best interest.  My

22  attorney has advised me that if I wish to appeal, any appeal, if

23  applicable to my case, must be filed within thirty days of my

24  sentence and/or judgment.

25       13.  I understand that these pleas and resulting

26  convictions will likely have adverse effects upon my residency in

12

1    this country if I am <u>not</u> a U. S. Citizen.   I have discussed the

2    effect my pleas will have upon my residency with my counsel.

3         14.   I offer my pleas freely, voluntarily, knowingly and

4    with full understanding of all matters set forth in the Amended

5    Information and in this Plea Memorandum.   I have read this plea

6    memorandum completely and I understand everything contained within

7    it.

8         15.   My plea of guilty is voluntary and is not the result

9    of any threats, coercion or promises of leniency.

10        16.   I am signing this Plea Memorandum voluntarily with

11   advice of counsel, under no duress, coercion, or promises of

12   leniency.

13        17.   I do hereby swear under penalty of perjury that all of

14   the assertions in this written plea agreement document are true.

15              <u>AFFIRMATION PURSUANT TO NRS 239B.030</u>

16        The undersigned does hereby affirm that the preceding

17   document does not contain the social security number of any person.

18        DATED this 19th day of October, 2016

19

20              _Timothy Randell_

21              DEFENDANT

22

23              _____
                TRANSLATOR/INTERPRETER

24   _Maize W. Pascal_

25   Attorney Witnessing Defendant's Signature

26   _____
     Prosecuting Attorney

                        13

EXHIBIT THREE

EXHIBIT THREE

1   4185

2   STEPHANIE KOETTING

3   CCR #207

4   75 COURT STREET

5   RENO, NEVADA

6

7                IN THE SECOND JUDICIAL DISTRICT COURT

8                 IN AND FOR THE COUNTY OF WASHOE

9            THE HONORABLE PATRICK FLANAGAN, DISTRICT JUDGE

10                          --oOo--

11  STATE OF NEVADA,                )
                                    )
12              Plaintiffs,         )
                                    )
13  vs.                             )   Case No. CR15-1360
                                    )
14  TIMOTHY RANDELL,                )   Department 7
                                    )
15              Defendant.          )
    _____    )
16

17

18

19                  TRANSCRIPT OF PROCEEDINGS

20                          SENTENCING

21                      December 22, 2016

22                          9:00 a.m.

23                         Reno, Nevada

24  Reported by:        STEPHANIE KOETTING, CCR #207, RPR
                        Computer-Aided Transcription

```
 1   APPEARANCES:

 2   For the State:

 3                        OFFICE OF THE DISTRICT ATTORNEY
                          By:  LUKE PRENGAMAN, ESQ.
 4                        P.O. Box 30083
                          Reno, Nevada
 5

 6   For the Defendant:
                          OFFICE OF THE PUBLIC DEFENDER
 7                        By:  MAIZIE PUSICH, ESQ.
                          350 S. Center
 8                        Reno, Nevada

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              RENO, NEVADA, December 22, 2016, TIME

 2

 3                          --oOo--

 4              THE CLERK:  Calling case number CR15-1360, State

 5    versus Timothy Randell.  Matter set for sentencing.  Counsel

 6    and the Division, please state your appearance.

 7              MS. BROWN:  Deborah Brown for the Division.

 8              MR. PRENGAMAN:  Good morning, your Honor.  Luke

 9    Prengaman for the State.

10              MS. PUSICH:  Maizie Pusich appearing with Mr.

11    Randell, your Honor.

12              THE COURT:  Thank you.  Good morning.  This is the

13    time set for sentencing in the above-entitled case.  The

14    Court is in receipt and has reviewed a presentence

15    investigation report dated November 30th, 2016.  The Court

16    has also received and reviewed a psychological evaluation

17    performed by Dr. Piasecki on December 18th, 2016.

18              In addition, the Court has received and reviewed a

19    sentencing memorandum that was dated both December 20th and

20    the 21st.  I guess when it was filed, some exhibits didn't

21    get in there, so they refiled it.  The Court has received and

22    reviewed those documents.

23              As to the presentence investigation report, have

24    counsel had an opportunity to review the report and are there
```

*I never got* (handwritten annotation beside line 19)

3

1    any facts, errors or omissions you wish to bring to the

2    Court's attention?  Ms. Pusich.

3            MS. PUSICH:  I don't have corrections, your Honor.

4    Thank you.

5            THE COURT:  Mr. Prengaman.

6            MR. PRENGAMAN:  No corrections, your Honor.  Thank

7    you.

8            THE COURT:  Thank you very much.  Ms. Pusich.

9            MS. PUSICH:  Thank you, your Honor.  Mr. Randell

10   and I recognize that this morning and throughout all the

11   paper work that you've seen, that he's here because he

12   participated in and committed a frightening, violent crime

13   spree.

14           He is remorseful and the first thing you know that

15   tells you that is the fact he pled guilty.  Although I spent

16   some time performing investigation on his behalf into

17   possible defenses, that doesn't diminish his level of

18   remorse.  I have a professional responsibility to do that and

19   I take it very seriously.  But that doesn't mean that he

20   didn't want to accept responsibility for this.

21           In fact, we spent several months, because

22   Mr. Prengaman had an amazing calendar last summer, asking him

23   if there was circumstances under which Mr. Randell could

24   negotiate this case, and ultimately he said, yes, and that's

4

1 what he did.  But in this case, your Honor, Mr. Randell has

2 been interested in accepting responsibility for the crimes he

3 committed for some time.

4          I do want the Court to be aware of certain

5 mitigation regarding Mr. Randell in this case, and the first

6 and most significant is his family background.  And I'll

7 candidly tell the Court that he doesn't talk much about it.

8 Most of the information I got from him was from his brother

9 and from other psychological evaluations that have been

10 performed on him throughout his life.

11          What we found, your Honor, is that as a result of

12 extreme trauma that was inflicted against him as a child up

13 to the age of nine when he was removed from his parents' care

14 because of the abuse, he was someone who really wasn't

15 raised.  I'd like to say he was just raised badly, but I

16 think that may give credit where it's not due.

17          He was taken from his family after a teacher

18 realized that his body was covered in whip marks and he was

19 put into foster care.  Unfortunately, after that, he turned

20 to drugs and alcohol, not because he thought they would be a

21 lot of fun, but because they helped him forget.  And Tim's

22 primary response to trauma really throughout his life has

23 been to try to forget.

24          One of the things that I did look into on his

I BEEN ON 2 MEDS FORA SHORT TIME IN MENTALL HEALHT COURT
WHEN THIS CRIME HAPPEN AND MY COUNSLOR SAID I DIDNT HALK TO
TAKE MY MEDS BCUZ I WAS WORKEN AN THEY MADE ME SLEEPY
SO I WASN'T ON MEDS WHEN THIS HAPPEN

```
 1   behalf was issues regarding amnesia.  In this case, he

 2   initially reported to the police when they questioned him

 3   that there were things that he did not remember.  That was

 4   consistent with some of what he had told people regarding the

 5   earlier case that was routed through Mental Health Court.

 6   And one of the questions I had was whether or not there was a

 7   valid medical explanation for the lack of memory he was

 8   describing.

 9           Interestingly, I found that among adults that have

10   not recently suffered a significant physical trauma like a

11   car accident or something like that, that there are about

12   seven or eight different types of amnesia recognized by the

13   American Psychological Association, several of which would be

14   consistent with Mr. Randell's background as a child abuse

15   victim and then turning to alcohol and substances as a

16   preteen and teenager.

17           Some of the things I found are that those are

18   usually characterized by a relatively sudden onset of the

19   condition.  That the person continues to know who they are,

20   even if they don't remember where they've been or what

21   they've done.  They continue to have their normal cognition.

22   If you give them small math problems or things like that, if

23   they can do it before, they still can.  And there may be

24   independent physical problems, such as limb paralysis,
```

1  involuntary movements or impaired word or language

2  recognition.

3       I also found that that can be short-lived.  People

4  can gradually recover their memories.  Sometimes it's because

5  their memories are recreated or even created by subsequent

6  information, but they do end up having a memory of what's

7  happened even if they initially did not.

8       The reason that I think that's important, your

9  Honor, is the State and people who investigated this case

10  believed at the beginning when Tim reported he didn't

11  remember anything, that he was being resistant and bad.  That

12  he was taking a horrible situation and making it even worse

13  by denying he remembered it.  I don't think, your Honor,

14  that's actually borne out by the other information that has

15  been obtained medically.

16       I also found, and this probably won't come as a

17  surprise to anyone who has had surgery, that amnesia can be

18  triggered medically or therapeutically, such as with

19  anesthetics.  People can have conversations, they can even

20  try and get up and move around under the influence of certain

21  medications and have no memory of that.  Again, it's not a

22  sign of any badness on their part, it's just the affect that

23  the medicines have on their brain.

24       One of the more interesting types of amnesia that

1    I looked into is something called dissociative amnesia.  The

2    reason I looked into that is because Tim is someone who has

3    had a long-term diagnosis of psychosis.  One of the things

4    that can be triggered is this dissociative amnesia and it's

5    primarily triggered by severe emotional distress, even if

6    that distress is caused by the person who is suffering the

7    condition.

8         So we know from the evaluations done regarding Tim

9    in this case and the ones that were referenced as having been

10   done previously in his young life is he has a psychosis that

11   is characterized by delusions and paranoia.  In his current

12   assessment, they find that he also shows signs of depression.

13   Of course, that shouldn't be a surprise considering what he

14   knows he has done and where he knows he is going.

15        The other thing that I looked into, your Honor, is

16   something called psychogenic amnesia.  That is something

17   commonly seen in children who have been abused.  They learn

18   to forget so they can get up the next morning and face

19   another day.  Because if they remembered, they probably

20   couldn't.

21        We do know that he was removed from his parents at

22   age nine.  There was documentation at the time that in

23   addition to physically abusing him, they were using drugs and

24   alcohol regularly.  He was placed in special education, but

1  he was not able to complete it.

2         We know now, your Honor, at the age of 27, there's

3  documentation suggesting he's been misusing drugs -- I'm

4  sorry -- alcohol since age 11 and drugs since shortly after

5  and that was another way for Tim to forget.  At those ages,

6  your Honor, his behavior is not considered his fault.  That's

7  abuse and neglect by his parents.

8         He has a documented medical history of blackouts

9  for years before this case.  I have been in cases in the past

10  where the State argues that the person's lack of memory in

11  the current circumstances is simply a convenient response to

12  realizing you're in terrible trouble.  But he didn't start

13  forgetting things at age 9 or 11 because he knew he would be

14  standing here facing these charges here today.  That

15  circumstance was documented long before this case existed.

16         You also know, your Honor, that the horrible and

17  sad situation that Tim grew up in, he only made worse when he

18  got older, because throughout his preteen and teen years and

19  after he turned 18, he used alcohol and a variety of street

20  drugs to forget, always to forget, but they still made

21  everything that he was going through worse.

22         And that's part of why we're here today.  We're

23  not here because drugs committed this offense.  That's not

24  what I'm saying.  Tim Randell committed these offenses and he

1   knows it.  But part of what turned him into the person who

2   was capable of doing all of these terrible things in June of

3   2015, those things are no longer in his system.

4          The young man who is seated next to me, calmly,

5   quietly looking towards his lap, has been seated next to me

6   calmly, quietly, paying attention, not being disruptive, not

7   causing trouble, because he's been in custody.  He doesn't

8   have alcohol.  He doesn't have controlled substances that are

9   not prescribed for him.  But he does have the prescriptions

10  that are appropriate for his medical conditions.

11         Tim has a limited ability to do much from the

12  Washoe County Jail to show the Court any type of positive

13  prognosis or ability to rehabilitate.  But while there, he

14  has attended classes.  He has earned a job in the jail.

15  Despite his charges, which are significant, we all know it,

16  he has been sufficiently responsible and reliable that he is

17  one of the inmate workers.

18         In the original complaint and information, your

19  Honor, several of the charges accused Mr. Randell with an

20  unknown male.  Mr. Randell advised me and Mr. Perez from the

21  Department of Parole and Probation and the State earlier in

22  the case that he was willing to be a witness, if needed.

23  That person is not identified in the charging document, but

24  is known.  He hasn't been asked, but he did make that offer.

1           Your Honor, away from drugs and alcohol, Tim has

2     been calm and reasonable and productive.  We recognize that

3     he's confined, and obviously that plays a role, but at the

4     end of this proceeding, he's still going to be confined for a

5     significant period of time.

6           He accepted the charges that were suggested by the

7     State, and as I noted previously, we were asking

8     Mr. Prengaman for a period of several months if there were a

9     way to negotiate.  It's easy for the State to say, well, he

10    realizes that the evidence looks bad, he just wanted to cut

11    his losses.  Your Honor, he wanted to keep the witnesses off

12    the stand.

13          Mr. Randell was visibly moved during the

14    preliminary hearing testimony of the victims.  He was, I

15    think, moved partly because he didn't remember everything

16    they were describing, but he recognized everything they were

17    describing was horrible.

18          And, again, your Honor, his previous lack of

19    memory, I do not think is a sign of sinister cunning.  It's

20    his go-to defense mechanism in a life in which until this

21    case, and the Mental Health Court case, he primarily was the

22    victim.  He clearly is not the victim here and we're not

23    suggesting that, but that's how he learned that coping

24    mechanism.

1        You're going to learn that Mr. Randell has been in

2   custody for a significant period of time.  You'll see that in

3   the credit for time served.  And as an inmate, his calls are

4   monitored.  One of the things that Mr. Prengaman gave us

5   notice of in the sentencing memorandum that was filed

6   yesterday and the day before was that he is going to rely on

7   some jail phone calls.  And one of the things he was

8   frustrated by is some of those calls have Mr. Randell

9   discussing whether or not he's going to have money on his

10  books.

11       Your Honor, I respectfully disagree with the State

12  that that's a sign of callousness.  I think it's wishful

13  thinking.  He knows he's going to be in custody a long time.

14  He would like to have some money on his books.  However, the

15  Nevada Supreme Court in Tavares versus State indicated that

16  simply having an inmate describe something that they think is

17  wishful thinking isn't really appropriate for this Court.

18       In that case, your Honor, what they were looking

19  at is whether or not a jury should be given a flight

20  instruction when Mr. Tavares said he wished he could get out

21  of the country.  The Supreme Court found he had absolutely no

22  ability to get out of the country and it was really just his

23  making an expression of wishful thinking to someone he

24  thought was friendly.

1              In this case, your Honor, Mr. Randell's comments

2     that he wished he had money on his books while he was in

3     prison is just exactly the same.  It's wishful thinking.  He

4     understands that any money he might have, and he hasn't had a

5     lot while he's been in jail, but maybe he'll get lucky and

6     that will change, is subject to removal from his books to pay

7     the restitution that will be ordered in the judgment today.

8              Your Honor, a person's response to trauma is not

9     always linear.  And by that I mean if Mr. Randell was accused

10    of attacking the parents who abused him, all of us in this

11    courtroom would have a much different conversation.  The

12    State probably would have charged things much differently.  I

13    would have had a different investigation with respect to

14    mental health, possibly self-defense or PTSD.

15             It's much more difficult to consider his

16    background when you're talking about innocent, total

17    strangers.  And there is no question in this case, your

18    Honor, that's exactly who all of these people were.  But that

19    doesn't change the fact that he was victimized repeatedly.

20             You'll find in the evaluation, the psychological

21    evaluation that was filed that one of the conclusions reached

22    is that Tim has a limited ability to emotionally regulate,

23    problem solve or develop mature judgment.  I think it would

24    be difficult under the circumstances that bring us here today

13

1   for anyone to disagree with that.

2           But those circumstances are not caused by Mr.

3   Randell, your Honor.  The only coping skills he ever

4   developed were substance abuse and forgetting.  We know those

5   are not defenses.  That's the reason we're not making these

6   arguments at trial.  But I think, your Honor, they are

7   mitigating.

8           I think the more important thing to consider in

9   the sentencing today is, how do we prevent tragedies like

10  these in the future?  Clearly, we can just lock Mr. Randell

11  up and throw away the key.  But I think that would be a weak,

12  ineffective response for us as a society.

13          My fondest wish is as we move forward we learn to

14  identify the children that are at risk much earlier and

15  provide them with the medical and mental health attention

16  that they need to overcome their traumas.

17          I feel like our system is backwards, because we

18  don't get Tim and all the Tims the help they need while

19  they're young.  We wait until we have the heart-wrenching

20  details of all that occurred to the victims in this case and

21  then we start calling him names.  We tell him he's a monster.

22  We tell him he's unredeemable.  And we tell him we never want

23  to see him again.  I think, your Honor, that's backwards.

24          So I don't think we should simply throw him away

1  like he has no human value, the way a generation of adults

2  did when he was just a child.  Every sentence available to

3  this Court today is going to feel like forever, and I don't

4  think our system should be surprised when a victimized child

5  becomes a victimizing adult, where our go-to response is

6  label them as monsters and lock them up like animals.

7          I think we need to stop putting all our resources

8  on the prison system and devote more to education and

9  intervention with our most vulnerable.  Young people are

10  incredibly resilient, but there are very few who can overcome

11  a lifetime of abuse without help while they remain young.

12  Simply waiting for them to hurt others and then vilifying

13  them will do no good.

14          Your Honor, I recognize that he's 27 today, he's

15  not 7, he's not 9, he's not 13.  But I don't think anyone can

16  show us that you simply get to age 18, flip a switch, and put

17  everything behind you like it never happened, that you

18  suddenly just grow up.  I know the law says on that day, you

19  can sign a contract, and when he turns 21, he can be legally

20  drinking for the 12 or 14 years he already had been.  But it

21  didn't suddenly resolve everything that had happened, a lot

22  more was needed do that.  Incarceration does provide

23  protective factors to the community, not only while Tim is

24  serving, but upon his release as well.

1          Do you have any information to suggest that Tim

2   will use his time in custody wisely?  I think you do.  He is

3   an inmate worker and there are limited positions for inmate

4   workers.  Among other things, he has to be trouble free and

5   responsible.  He has to follow the instructions without

6   attitude or complaint.  Because they have lots of other

7   people who would be liking to spend their time with a little

8   less sitting around or watching TV or reading books.  There

9   will be many people in line to take that job if he doesn't do

10  it right.

11         We know that Tim stopped taking his appropriate

12  prescribed medications before the crimes in this case.  He

13  was in our Mental Health Court program.  That's supposed to

14  help people.  That's a good program, but it's only as good as

15  you following the medical advice that you're given, and he

16  wasn't, your Honor.  He'd been taken from that absolutely

17  appropriately, we understand that, so we used what available,

18  appropriate resources to try to help him and it didn't get us

19  everywhere we needed to go, your Honor, obviously, because

20  we're here with these people who have gone through so much.

21         But the lowest sentence that you can give on

22  Counts Two and Three, if you choose to make them parole

23  eligible at all, will have him coming up for parole

24  eligibility on that Count at earliest at age 42.  Depending

16

1  on what happens with the other counts, it may be

2  significantly later.

3         Tim has never spent 15 years in custody.  He's

4  only 27.  He may have felt while he was growing up that

5  custody was a better alternative, but that isn't what

6  happened.  The difference today between having him in Mental

7  Health Court, using drugs and alcohol and failing miserably,

8  is there will be a significant period of enforced sobriety

9  and appropriate medical attention available to him before he

10 would ever be considered for release in the future.

11        So, your Honor, with respect to my discussion on

12 amnesia, whatever its genesis, we recognize it's not a

13 defense to the charge, but it's also not an aggravating

14 condition.  It's a medical condition.  As I said before, most

15 of my information about his background and childhood trauma

16 came from his brother.

17        In this case, your Honor, what the defense is

18 requesting is with respect to Count One, you follow the

19 recommendation of parole and probation.  With respect to

20 Count Two, I'd ask the Court consider life with parole and

21 concurrent with Count One.  The facts of the case show that

22 the attempted murder in this case truly was an attempt.  It

23 was completely ineffectual and thank goodness.

24        With Count Three, your Honor, I ask that you

*I was getting off soon* [handwritten annotation]

THERE WAS NO GUN NONE DURING THE KIDNAP THE VICTIM WALKD TO THE NEXT ROOM I DIDNT HAVE TO FORCE HER TO MOVE SHE WAS NOT HURT GOIN FROM ONE ROOM TO THE NEXT THE KID NAP SHOULD OF NEVER HAD SBH

1  impose life with the possibility of parole after serving

2  15 years.  On Count Four, we're requesting life with the

3  possibility of parole concurrent with Count Three.  In this

4  case, your Honor, the kidnapping was movement for a short

5  distance.  It does comply with the requirement of the statute

6  that it increases the risk to the victim, but we would

7  respectfully submit, your Honor, it's not on the same level

8  as someone who is moved to another home or another city.

9       Finally, with respect to Count Five, we ask that

10  you follow the recommendation of parole and probation.

11       THE COURT:  Thank you, Ms. Pusich.  Mr. Prengaman.

12       MR. PRENGAMAN:  Thank you, your Honor.  Your

13  Honor, the victims in this case are present, Krystal, her

14  father, Francisco, and Jose, as well as Krystal's mother.  I

15  would like to invoke their statutory right to speak last in

16  the proceedings.  I know that Krystal and her father and her

17  mother wish to address the Court.  I don't believe Jose does.

18  But I believe we'll have three impact statements to make.

19       Judge, I would ask that the Court admit as

20  exhibits in evidence for the purposes of this sentencing the

21  six exhibits that were attached to the State's sentencing

22  memorandum.

23       THE COURT:  All right.  We'll admit those Exhibits

24  1 through 6.

18

1          MR. PRENGAMAN:  Additionally, your Honor, I've

2     marked Exhibits 1 through 18, 17 of which are photographs,

3     but I would move at this time for their admission.

4          THE COURT:  Have you shown Ms. Pusich?

5          MR. PRENGAMAN:  I have, your Honor.

6          MS. PUSICH:  Yes, your Honor, he has.

7          THE COURT:  We'll admit those as well.

8          MR. PRENGAMAN:  Thank you.  Your Honor, I'll

9     address what the defense has presented as mitigation.  Much

10    of what you heard was addressing what I'll call a general

11    characterization of a social ill, things generally about the

12    system and generally about, as Ms. Pusich put it, kids.

13         This case isn't about general societal ills.  It's

14    about this specific defendant and these specific victims and

15    what he did.  What he did shows not detachment from reality,

16    far from it.  It shows absolute -- that he was absolutely

17    intact with reality, that he was operating as a goal-oriented

18    predator.

19         And I'm going to submit to you that what has been

20    put forth as mitigation, if it's true, and as Ms. Pusich

21    acknowledges, a lot of it, most of it comes from his brother

22    who I don't believe is present today and we're not going to

23    hear from.  Even assuming it's true, it may be sad that that

24    happened to Mr. Randell, if it at all happened to him.

1          But the bottom line is that there's unfortunately

2    many people who have bad childhoods, who are abused.  They

3    don't all grow up to invade somebody's home and viciously

4    hold them hostage, steal property, and rape a child, a girl.

5    They don't do it.  And so the idea that somehow he was forced

6    into this mold and, yeah, of course, of course somebody with

7    that background is going to wind up viciously terrorizing a

8    family and raping one of this community's daughters is, I

9    would suggest, absurd.

10         As sad as it is, is it related?  Did it cause him

11   to do what he did in this case?  No.  What caused him to do

12   it is a desire to steal this property and an absolute

13   disregard for his fellow human beings.  That's what caused

14   him to do it.

15         In this case, Krystal and her boyfriend Jose were

16   coming home.  They were a family.  She and her father and

17   Jose all lived together in an apartment.  And the

18   circumstances show they were of modest means.  They didn't

19   have a lot.

20         But Jose had been working and Krystal went to pick

21   him up and they did a number of things and wound up coming

22   back to the apartment in the car.  Krystal was driving.  And

23   we know from the surveillance video in front of the apartment

24   complex that when Krystal and Jose pull into the complex,

1  there's a brown SUV that through investigation was linked to
2  ultimately the defendant and that's the car that we believe
3  he was in with his co-offender.

4         That car is seen passing by the entrance right
5  behind Krystal and then it turns around and pulls into the
6  complex.  As Jose and Krystal are going upstairs, because
7  their apartment is on the second floor, as they are
8  approaching the door, they're aware that there's a black
9  male, this defendant, with a gun rapidly approaching them.
10 So they rush in.  Jose tries to close the door.  The
11 defendant gets part of his body blocking the door.

12        And while Krystal runs back to her father to try
13 to get him to help, Jose is trying to block the door, close
14 the door to prevent the defendant from entering.  He fires
15 the gun.  He shows he means business and he shoots into the
16 residence.  We have the bullet hole and the evidence to
17 corroborate all of that.

18        So when he fires in, he's able to get into the
19 apartment, and he proceeds to get all of the occupants into
20 the same room, the front room, the living room.  He begins
21 taking their property, demanding money.  He takes Jose's
22 wallet.  He rips the necklace off of Krystal's neck.  He has
23 them collectively held and he begins demanding money.  He
24 begins searching the house while he's got them subdued, be

1    quiet or I'll shoot you, and proceeds to start searching.

2            He then moves them into one of the bedrooms in the

3    residence and has them lay -- initially, Krystal and Jose

4    initially on the bed face down, and Jose on the floor.  And

5    then ultimately he moves Krystal and Jose to the floor face

6    down.  Again, don't move or I'll shoot or you're dead.

7            He tells them if anybody tries to get up and

8    leave, I've got somebody else outside waiting for you.  He

9    then, again, proceeds to start searching the house for

10   property to steal.  He gets on his cell phone.  He calls his

11   co-offender and the co-offender comes up.  And then they both

12   begin to search the house for property and they collect it.

13           They collect property, the Play Station.  They

14   collect all of Krystal's, not that she had a lot, but all of

15   Krystal's jewelry.  So the things that she had most important

16   to her, they took that.  They took a backpack and put the

17   items they were going to take in it.

18           And while they are doing that, the defendant

19   begins questioning.  He's got the gun.  He maintains holding

20   the gun and displaying the gun, pointing the gun throughout

21   this ordeal.  He begins questioning, because they find some

22   women's clothing in one of the other bedrooms.  He begins

23   questioning the victims about who else lives here, he might

24   come back.

I DONT THINK ANY OF THESE REPORTS ARE VICTIMS FIRST STATEMENTS

1    And in the course of that, asked Krystal how old

2  she is when he finds out that Jose is her boy friend and she

3  tells him 16.  Here, not only does he demonstrate what he is

4  doing is goal-oriented, he has located his victims, he's

5  followed them, he's forced his way in, he's fired the gun to

6  obtain entry.  He's demonstrated immediately what he's after.

7  He's initially after property.  He's there to steal, to rob.

8    He demonstrates how intact he is with reality.  He

9  begins -- he brings up the subject of raping Krystal.  He

10 starts talking about, oh, you're lucky, we have rules, you're

11 too young.  And as I have indicated in Krystal's testimony in

12 my sentencing memorandum, as Krystal told the police, she was

13 fighting back tears.  She was terrified when he brought up

14 that, when he imposed that subject, and there the whole

15 family subdued at gunpoint.

16    And he continues to talk about it, you're lucky,

17 we have rules, you're too young.  And then he returns to the

18 subject, and that is showing, judge, that he's thinking about

19 it.  He's thinking about the prospect, even though he knows

20 this girl is 16, he voiced what everyone would say, not just

21 that rape is wrong, but how young she is.

22    And then he comes back to it, talks about how

23 pretty she is, how I'm having trouble fighting back.  And

24 then he begins touching her and he violates her as she lays

1   there with her father and Jose in that room.  And then he

2   gets her up and forces her into the bathroom.  And within

3   earshot of her father and Jose, he forces her, he undresses

4   her, and one of the reasons I wrote that memorandum is so I

5   wouldn't have to --

6           THE COURT:  I've read it.

7           MR. PRENGAMAN:  -- go into every detail.  But he

8   then, not only does he violate her over and over, but he with

9   that gun, he threatened her, he threatened, if you don't

10  comply, I'm going to go over and kill Jose.

11          He at times pointed the gun at her head, and not

12  only was it him, but he facilitated his co-offender.  He was

13  the one with the gun.  He initiated everything.  He brought

14  the co-offender up.  He is the one who facilitated the

15  co-offender assaulting her as well.

16          As the facts demonstrate, horrific on so many

17  levels, not just the fact of the assaults, repeated assaults,

18  but the demeaning things that he said to her, that Jose and

19  her father had to listen to knowing what was happening, the

20  comments that he made essentially taunting her about his

21  enjoyment of what he was doing.

22          As she testified, she thought she was going to

23  die.  She believed that when this was happening, based on the

24  things that he said, his actions, that she was going to die.

```
 1   And when they had finished, and at length, when they had
 2   finished, and this is -- we're talking about something that
 3   we know from a fairly well-established time line, the time on
 4   that surveillance video that Krystal and Jose get back to
 5   their apartment and this happens and then when they call the
 6   police, we have a very good idea, not to the minute, but a
 7   good idea of how long they were in there.  This was hours
 8   that they were in this apartment and terrorizing this family.
 9   We know from Krystal's testimony and the testimony of the
10   victims that the assaults were at length.
11           The defendant, again, when they had finished, he
12   then again in the course of what he was doing, he
13   demonstrated he was right there in reality.  Then
14   demonstrating, again, highlighting, underscoring he knew what
15   he was doing was wrong and he appreciated the possible
16   consequences.  He then forced -- he made her get into the
17   bathtub, put the gun to her head, and then forced her to wash
18   herself and then to gargle with water, she said about ten
19   times.
20           And then he took like a loofa type of rough sponge
21   and scrubbed her vaginal area himself and then also again
22   violated her.  And he said that, he even voiced to his
23   co-offender what he was doing, which was making sure that
24   there was no DNA left behind.  So he appreciated the
```

1    consequences. He knew what he was doing was wrong. He was

2    trying to cover it up.

3            So then they move Krystal out, and as both Krystal

4    and Jose described, they continue to go throughout the house.

5    They gather up property, put it in the backpacks. And then

6    they witness, both of them hear the two men, the defendant

7    and his co-offender, discussing what they should do next.

8    They actually have an argument about what to do with the

9    victims. And it is the defendant who is the one pushing, we

10   need to kill them. We need to end their lives so that we

11   won't get caught, in essence, so they can't identify us.

12           And so as Jose and Krystal testified, the

13   co-offender puts up some resistance to that. We can go.

14   They won't know. But, ultimately, they agreed that's exactly

15   what they're going to do.

16           So the defendant goes out and he manually, they

17   have Krystal in the front room, and they made her lay down on

18   the floor again, and he manually strangles her and she

19   described, again, she thought she was dead. She lost

20   consciousness. She tried to struggle against it. He

21   strangled her to unconsciousness. From that conversation, we

22   know it was to kill her. It was to try to cover up the

23   crimes so they wouldn't get caught.

24           So she was unconscious. The co-offender then went

1    into the bedroom where Jose and her father were.  He bound

2    them both and then he used a cord from the room and he

3    wrapped it around Jose's neck and he strangled Jose to

4    unconsciousness.

5            Then they both, as Jose testified, because he was

6    unconscious, but he came to, and he began crawling, trying to

7    crawl out of the room, and then was aware they were still

8    there.  A shot was fired in his direction.  Again, there's a

9    shell casing in the apartment.  There's another bullet, two

10   bullets are found corresponding to the one the defendant

11   fired when he first came in and then when Jose was crawling

12   out of the bedroom.

13           So Jose rolled over, and as he described,

14   essentially stopped moving, played dead, and he hears them

15   discussing this sort of the setting the fire -- not sort of,

16   but setting the fire.  So they do.  They grab whatever and

17   finding flammable things, they're trying to find flammable

18   things to start the fire.

19           They end up, as we know from the investigation,

20   when the police arrived, they spread oil, they spread it

21   everywhere throughout the apartment.  They started a fire in

22   a pan on the stove where they poured a bunch of oil.  And

23   then when the fire alarm started going off, they took the

24   property and they left.

1        Now, Jose and Francisco were able to wiggle out of
2    their bindings and they were able -- I'm sorry -- Francisco
3    was able to remove the pan and stop the fire before it
4    spread.
5        But that doesn't -- the fact that they were
6    fortunately spared doesn't change their intentions or what
7    they did.  These men talked about killing the victims and
8    they tried to kill them.  And now, fortunately, Krystal was
9    unconscious, but she wasn't dead.  Jose was able to help her
10   out of the apartment.  So those are the facts of what they
11   did, your Honor.
12       Now, the police through DNA were able to identify
13   the defendant.  This was not, as we all know, his first brush
14   with the criminal justice system.  And they were able to
15   arrest him within a couple of days.
16       And when they first talked to him, he didn't say,
17   I don't remember, I had amnesia.  Gosh, I don't know.  What
18   he said was he gave an alibi.  He gave a story.  I was with
19   my girlfriend in her house and he gave a specific time line.
20   I got gaps, I don't know.  He gave the time line for the days
21   around the offense.
22       And he claims specifically at the time of this
23   offense, these offenses, that he was at home with his
24   girlfriend, with her children, and I spent the whole night

28

1    until the next morning and he gave an alibi.

2          Now, she didn't back that alibi up.  She said, in

3    fact, that he had left the apartment late in the night and

4    that he didn't return until the early morning.  So he was

5    gone during that time period when the crime happened.  That

6    when he returned, he had talked about that something bad had

7    happened, that they had done something stupid.

8          And then when the police returned to get an

9    evidentiary sample of DNA, because the prior DNA match was

10   done with the sample that had been put in the system from his

11   prior felony, he wanted to talk about the offense again.  And

12   it was then that he injected the idea, you know what, I was

13   drinking, I was high on ecstasy, I don't remember what

14   happened, but my partner told me some things that happened.

15   It was only then that he injects this idea of amnesia or that

16   he doesn't remember or he's blacked out because of alcohol

17   and ecstasy.

18         Ultimately, I'll submit to you, your Honor, I

19   don't mean this to be glib, but that it does not matter

20   whether he had amnesia or didn't.  What that shows is that he

21   didn't.  He was lying.  He was lying about what happened.  He

22   didn't, again, say initially to the police, I had amnesia.

23   I've got these issues.  He denied it and gave an alibi that

24   later turned out to be false, not just by the facts and

1  circumstances, but from his own girlfriend who didn't know

2  the story, who wasn't -- because he hadn't had the

3  opportunity to get her on board with what the story was.

4  Then he tells the amnesia story.

5           And, in fact, he told them the first time, I

6  didn't do no wrong.  Even though they confronted him with the

7  facts of what happened, confronted him with that there was

8  DNA evidence, he, I didn't do no wrong, he flat out denied

9  it.

10          Additionally, your Honor, as I mentioned in my

11  memorandum, as the police investigated, they connected a

12  robbery that happened right before these crimes were

13  inflicted upon the victims here, only a couple of minutes

14  away, two miles away, a few minutes away, right -- the report

15  went out at about 12:30 a.m., the same time that the

16  defendant's vehicle was seen, approximately, turning into the

17  victims' complex in this case.

18          But what we know is that a little while before

19  that, a victim in another apartment complex observed -- she

20  described a brown dark colored SUV.  When she was coming home

21  to her complex, she stopped at the community mailbox to check

22  her mail.  She noticed this vehicle that pulled in, the brown

23  SUV, and kind of stopped.  She returned to her car on her way

24  to go up to her apartment when she was approached by a black

```
 1   male.  She gave a description very similar to this defendant,

 2   age, height.  She gave -- she said a medium build, wearing a

 3   hat, which was a -- she described it and it's very similar to

 4   the hat that Krystal talked about at the preliminary hearing

 5   that we have a photograph of, that the defendant's girlfriend

 6   said was hers that the defendant would wear.

 7            So the black male approaches her with a gun, which

 8   she describes as a semi-automatic distinctive looking

 9   firearm, sort of I would characterize it as an Uzi type of

10   handgun, which is very similar to what Jose and Krystal

11   described as being the gun the defendant wielded.

12            He robbed her, give me your property, tore the

13   necklace off her neck, just as he had done to Krystal.  He

14   took whatever property she had, made her toss her keys away,

15   and then fired a round right there, left a shell casing

16   behind, and then took off.

17            So the victim in that case, he took her cell

18   phone, that was part of what he stole, so she went to try to

19   get a neighbor to call the police.  Nobody was home.  So she

20   went over to a nearby convenience store.

21            So we know that when she actually called, by the

22   time she got to call the police and reported it, it was

23   around 12:30.  That had happened some time before, plenty of

24   time for the defendant and his co-offender to get over
```

*(handwritten annotation across top of page)* THEY WAS NOT GOING TO FILE A CHARGE ARE INVESTIGATED IN THIS CASE BUT HE BRUNG IT UP AS IF I DID IT DURING MY SENTENCEN AND SAID I DID IT PUBLIC DEFENDER NEVER OBJECTED

```
 1    Krystal's complex.

 2              And we know from forensic evidence that that shell

 3    casing at that robbery scene matches the one that was from

 4    the defendant's gun that he fired inside Krystal, Jose

 5    Francisco's residence demonstrating the same firearm fired in

 6    both of those.

 7              Now, that's not charged in this case, your Honor,

 8    but I submit it's relevant for the reasons I outlined in my

 9    memorandum.  It shows that this defendant, again, he's not

10    disassociated from reality.  He's intact with reality.  He's

11    a predator out looking for prey.  Found his first prey,

12    robbed her, did actions that are extremely similar, I would

13    suggest, MO type of conduct, firing the round to demonstrate

14    that he's serious.  And then he proceeds on and he finds his

15    next prey, which is, unfortunately, Krystal and Jose as

16    they're returning home that night.

17              So, your Honor, as far as mitigation in this case,

18    again, the evidence shows that this is not a product of any

19    disassociation with reality.  It's the opposite.  He knew

20    exactly what he was doing.  All he cared about is his own

21    hedonic, satisfying his own desires, and he cared not what he

22    was doing.  Utter disregard for his fellow human beings.

23              Krystal, of course, the other disregard for what

24    he subjected a girl, 16-year-old girl to.  For her father,
```

1   who had to while being held witness, not just the invasion of

2   their home, not just being terrorized, not just being

3   subjected to the idea that we could be killed, this man has

4   fired a gun, he's so brazen that he fired a gun in an

5   apartment, in an apartment complex, and he could kill us.

6   When he said he might kill us, he means business.

7         And then Jose, 18 years old at the time, but,

8   again, like the father, in a different way, having to be

9   subjected to not only that, the violation of their home, the

10  being utterly powerless in the face of somebody who is taking

11  your property and might do you serious harm or kill you.  But

12  then being forced, powerless, not just know, but to hear

13  what's happening to Krystal in the next room.

14        That's not a product -- you can't draw a straight

15  line between this man's childhood, whatever it was, and these

16  crimes.  These are crimes of intent and premeditation.  He

17  thought about what he did to Krystal.  He voiced it.  He

18  voiced he knew it was wrong, he thought about it, and he

19  decided to go ahead and do it anyway, and then he tried to

20  cover it up.

21        And in doing so, the way it was talked about that

22  he tried and didn't succeed with the victims, I suggest that

23  diminishes what they did.  He strangled, tried to strangle

24  the life out of Krystal with his bare hands.  And this

1    family, same with Jose, and it is no -- it is an

2    understatement of fact to say they were terrorized.

3              Overall, I submit, that everything that has been

4    suggested as mitigation, and I'm not saying it has no

5    mitigating value, but in the context in which this crime

6    occurred and the intent and premeditation with which it was

7    executed, the predatory nature of it, what I suggest to this

8    Court is that mitigation does not even come close to bringing

9    down what the sentences should be in this case.

10             Any value to that mitigation pales in comparison

11   to the injury, the harm that this man has inflicted, a

12   legacy, as I submit in my memorandum, a legacy he left to

13   these victims.  It didn't just end with the -- when the hours

14   long ordeal ended and they could finally get to police and

15   get to safety.  He left a legacy.

16             And we know any victim who has their home

17   burglarized, they're not even home, but we know that that

18   victim suffers not just a loss of property that may have been

19   stolen, but a diminishment of their quality of life, because

20   they know their home has been invaded and that takes away

21   something essential, a belief that we have as citizens in the

22   sanctity of our home and our property.

23             It diminishes, in ways, our confidence in our

24   public institutions to protect us and that our laws will

1  protect us.  And this case is hundreds of times above that,

2  the legacy that this defendant has left.  Not just the

3  invasion of the home, but the loss of property, the violence,

4  the terror, and then what he subjected the family to, the

5  father, the boyfriend that has to know what they know and

6  witness what they did and of course what happened to Krystal.

7          The idea that he wanted to keep her off the stand

8  so that should bring down the sentence or mitigate what the

9  sentence should be, well, your Honor, if this defendant had

10  said that from the beginning, again, I'm not going to say it

11  has no value, but it has very little value here.  Krystal had

12  to get on the stand at the preliminary hearing and she had to

13  testify in a room of strangers about the awful things that he

14  did.  And you can see that.  Her testimony is attached as

15  evidence in this case.

16          So I suggest that it is once he saw -- she had to

17  take the stand, she wasn't prevented from doing it, and once

18  he saw that she -- that while it was an ordeal for her, an

19  emotional ordeal, while she at times broke down and cried,

20  that she wasn't going to crumble, that she was going to be

21  able to tell what happened, she was going to be able to

22  identify him.

23          And so I would submit that what the prime moving

24  factor for him was to do whatever he could to minimize what

1  he was facing.  Again, I'm not going to say it has nothing,

2  because the primary reason the State was willing to negotiate

3  the case, and that's not before the Court today, but is that

4  Krystal would not have to testify again.

5          But, again, it's not like he kept her off the

6  stand.  It's not like he preserved her from having to ever

7  talk about this in court.  She did.  She had to talk about it

8  in court.

9          And the idea that this is some response to past

10  trauma, again, I would submit Dr. Piasecki doesn't talk about

11  amnesia.  She doesn't relate most of what Ms. Pusich has

12  talked about today.  Dr. Piasecki does not talk about that.

13  She doesn't relate any of these things to the crime.  She

14  just sort of gives a general overview.

15          But the idea that this is somehow a response to

16  trauma, again, I would submit, your Honor, that's just false.

17  We know from the facts and circumstances, this is a result of

18  this man's desire to obtain things illicitly, without working

19  for them at the expense of others and his lack of concern for

20  others.  There's no link between these things that Ms. Pusich

21  discussed in his past and what he did to the victims in this

22  case.

23          It is fundamentally distinct and different and,

24  again, while there may be some mitigating, if what has been

NOT DURING THE SEXUAL ASSAULT

1   represented is true, it pales when you consider what he did

2   and his demonstrated reasons for doing this.

3          I want to show the Court, I don't know that I need

4   to display these, I think the Court can look at them.  But

5   those photographs show the aftermath, the injuries to

6   Krystal, to her throat, the petechia, the bleeding in her

7   eyes that was caused when she was strangled.

8          There's two photos in there.  The first ones are

9   Krystal at the hospital.  And then there's a second series

10  where she's dressed differently.  That evinces two things,

11  one, that on the 24th of June when the sexual assault nurse

12  visited Krystal to document how her injuries were, you can

13  see that she still has injury to her throat, front of her

14  neck.  You can see that she still has the bleeding in her

15  eyes.  Her eyes still have a lot -- it looks pretty similar

16  to how she was in the hospital.

17         But see one of her reactions.  She's changed her

18  appearance.  She's cut off all of her hair in reaction to

19  what has happened to her.  But when she testified about the

20  prolonged nature of her pain and the injuries that this

21  defendant inflicted, there's evidence of it right there.

22         You can see Jose in the photos when they were

23  bound and duct-taped.  You can still see the duct tape around

24  their necks after they come out and the police are there.

1   want -- what can I do?  Something?  It would be to pay some

2   restitution, to have some of the money he has available go to

3   the victims in this case.  But he doesn't even want that, not

4   even part of the $300.  It's all about him and his comfort

5   when he goes to prison.  That's evidence of his character,

6   your Honor, this Court can certainly consider.

7           So, your Honor, in this case, the State, and

8   you'll hear from the victims, but the State, I submit the

9   following, the Court sentencing in this case should do a

10  number of things and first it should punish this defendant

11  for what he did.  For what he did with ill, mean, bad intent

12  at every level and in each of these crimes, this Court should

13  first and foremost punish him.

14          And I submit that the punishment this Court should

15  give is the maximum.  On Count One, the attempted murder,

16  this defendant -- and he is responsible not just for his own

17  actions, but those of his co-offender.  He facilitated it, he

18  brought the co-offender up, essentially brought his

19  assistance into the mix, and he facilitated the participation

20  of his co-offender in all the crimes, including the sexual

21  assaults.

22          So as to the attempted murder, they did, not just

23  -- they didn't just attempt to murder all of them with the

24  fire and fortunately they got it before it got very far, but

1   You can see on the back of his neck the ligature marks from

2   where the cord was wrapped around his neck and the

3   co-offender did strangle him into unconsciousness.  And you

4   can see Francisco.

5           Your Honor, Exhibit 18 is in evidence.  What it

6   shows, and I think I would like to play the one call where he

7   talks about the restitution.  I think it's just under five

8   minutes if the Court would allow me.

9           THE COURT:  All right.

10          (CD played at this time.)

11          MR. PRENGAMAN:  I'll stop it there.  The rest is a

12  similar discussion, your Honor.  Now, Ms. Pusich has argued

13  that Tavares somehow controls.  It doesn't.  Tavares talks

14  about maybe getting a flight instruction admitted at trial.

15  This is evidence of character, which is well within this

16  Court's ability to consider.

17          But what this shows is that the defendant has come

18  in today and said he feels remorse, that he's very sorry for

19  the victims.  But what this call shows is that behind closed

20  doors, he doesn't even want -- he's still concerned with

21  himself.  It's me, me, me, my comfort in prison, not even

22  wanting to have what is really a meager amount go to the

23  victims in this case.

24          If he truly felt that, yes, I'm truly sorry, I

1  they clearly intended to leave no living witnesses behind and

2  ran when the fire alarm started going off because they

3  couldn't -- they weren't able to shut it down.

4           Before that, the co-offender strangled Jose to

5  unconsciousness after their conversation, we need to kill

6  them.  With the defendant saying, I'll take care of the girl,

7  you take care of the other two.  So he went about doing that.

8           The defendant tried to strangle Krystal, not try,

9  but he strangled her to unconsciousness.  And then their

10  final action in that regard is attempt to set the apartment

11  on fire.  For what they did to all three of these victims who

12  are named in that Count, this Court should impose the maximum

13  sentence of 8 to 20 years.

14           In this case, the deadly weapon, your Honor, this

15  is not a case where you have a deadly weapon that plays some

16  collateral feature.  This deadly weapon is at the forefront

17  of each of these crimes.  It is the way the defendant got

18  into the apartment.  He fired a round from that gun.  Not

19  just display, not just brandish or menace the victims with

20  it, he actually fired it twice in the course of these crimes.

21           And I think you can see from their testimony, that

22  factored in for these victims.  That factored into their fear

23  and their beliefs that when he said he would kill them, he

24  was serious if they didn't comply with their demands.

1            And so using the gun in that way, not just to,

2     again, facilitate, you stay there while I take your property,

3     but firing it, threatening, it facilitated everything they

4     did in that house.  And for that reason, this Court should

5     impose the maximum sentence for the deadly weapon

6     enhancement, 8 to 20.

7            For the three Counts that address, and I'll only

8     say the term once, but the gang rape that these men inflicted

9     on Krystal, this Court should impose the maximum sentence.

10    This defendant deserves to be punished with the maximum

11    sentence of life without the possibility of parole for the

12    sexual assault, Count Two, with the use of a deadly weapon

13    causing substantial bodily harm for what they did to her and

14    the substantial harm they inflicted upon her and the way they

15    did it.

16            I'm not going to talk about, especially when

17    Krystal talks about the defendant's last part of the assault

18    on her, what he did was so cruel, so demeaning to her, but

19    sort of just to the end, everything, this horrific event with

20    these two men, and then for the defendant to do what he did,

21    he deserves to be punished with the maximum sentence, which

22    is life without the possibility of parole.

23            And, again, the gun, the way he used the gun to

24    facilitate those crimes, he used it to facilitate what he

1  made Krystal do and what he forced her to do and the deadly

2  weapon enhancement should be the maximum for the way he used

3  that weapon in these crimes, 8 to 20.

4      He should receive, again, for the Count Three and

5  Count Four, which are the kidnapping.  The Count Three, he

6  should receive the maximum sentence.  And as to the

7  kidnapping, and Ms. Pusich says it was only a short distance,

8  but you can see Krystal, what Krystal's testimony was.  She

9  was terrified when he injected the subject of rape.  He then

10  talked about it.  He violated her with his fingers while she

11  was still in that room.

12      And then he got her up, forced her, marched her in

13  and she was terrified, not only thinking -- knowing what was

14  coming and she was going to die.  And substantial harm did

15  result from that conduct.  And for that, your Honor, you

16  should impose the maximum sentence, life without the

17  possibility of parole, and the maximum deadly weapon

18  enhancement of 8 to 20.

19      As to Count Five, three victims and their

20  property.  And although he took a lot, they took a lot, and

21  Krystal's jewelry, rings off her finger, necklace off of her

22  neck, and, again, we're talking about a family of modest

23  means, but he took the things that were most significant to

24  them, all the jewelry that Krystal had, the Play Station, the

1   money that they had, Jose's wallet and cell phone, and

2   Francisco's wallet and money.

3          Again, how did he do it?  He didn't do it on the

4   street.  He did it in their home.  He did it with a gun that

5   he fired to obtain entry into the house and we're talking

6   about all three of them.  And for that, judge, you should

7   impose the maximum sentence of six to 15 years and the

8   maximum deadly weapon enhancement.

9          And, your Honor, again, the mitigation in this

10  case, I submit, pales in comparison to these crimes and they

11  should all run consecutive.  There should be no measure given

12  to this defendant for these crimes, no benefit, no package,

13  no it's too many years.  It's not too many years.  If you

14  look at each of these crimes, he deserves the maximum and he

15  deserves to have them imposed consecutively.

16         The Court should impose those sentences and that's

17  to punish him.  The Court should impose those sentences to

18  enforce the law.  Any violent act, not only threatens the

19  safety of the victims, but it does, it diminishes, especially

20  something as serious as this, it diminishes our collective --

21  it undermines our belief, our confidence in our public

22  institution's ability to protect us and to enforce the law.

23         That's why enforcing the law is so important.

24  This sentence should enforce the law.  It should not just

1    punish, but it should be rendered so the public can see that

2    the punishment matches the crimes and that it can work

3    towards restoring the confidence that this defendant has

4    undermined in our collective safety, not the just the

5    specific victims in this case, but our collective safety from

6    people like this defendant.

7            It should also incapacitate and deter him

8    specifically.  He should never have the opportunity to walk

9    around in our community or any community again.

10           What he's done demonstrates his capacity and

11   willingness to violate the law and disregard the safety of

12   his fellow citizens.  But if what the defense says is true,

13   then he's a ticking time bomb and we cannot afford to put him

14   out there either.  So either way you look at it, I submit,

15   this man should never have the ability to walk among his

16   fellow citizens again.

17           And, lastly, your Honor, I submit that this

18   sentence should send a message to the public, to everyone.

19   It should tell all of those who have evil on their minds,

20   like this defendant, that the last thing you want to do is

21   contemplate terrorizing one of this community's families, the

22   last thing you want to do is contemplate raping one of this

23   community's daughters, because you take your life in your

24   hands if you do.

1          Thank you, your Honor.  And unless there's any
2    questions from the Court, I'd like to ask the victims to give
3    their statements.
4          THE COURT:  Before or after the defendant?
5          MR. PRENGAMAN:  My apologies, your Honor.  I want
6    them to go last pursuant to statute.
7          THE COURT:  Ms. Pusich.
8          MS. PUSICH:  Your Honor, before Mr. Randell speaks
9    to the Court, I did want to interpose on objection.
10   Mr. Prengaman is very precise in his language and that's been
11   my experience with him.  And throughout most of his argument,
12   he asked you to hold Mr. Randell responsible for the fact
13   that he facilitated the 24-year-old adult male co-offender.
14          However, at the very conclusion of his argument,
15   he asked you to hold him responsible and sentence him for the
16   crime of the co-offender, and I don't believe that would be
17   appropriate or lawful.
18          THE COURT:  Thank you.  Mr. Randell, the law
19   affords you an opportunity to address the Court at the time
20   of sentencing in terms of the presentence investigation
21   report, mitigation, punishment, any matter you wish to
22   address the Court, I invite you to do that now, if you wish,
23   sir.
24          THE DEFENDANT:  Yes, I do.  I would like to start

1   by apologizing for what I've done, allowing myself to be

2   irresponsible.  I make no excuses.  I take full

3   responsibility.  I know now that I'm going to prison, I heard

4   that NNCC have a good mental health unit.  I wish to get

5   involved with that.

6          The phone call you just heard was my sister

7   sending me a little money she did have.  So I didn't want to

8   use that all up or get it taken away from me, because I know

9   she doesn't have much to send.

10          This was a foolish thing.  I made a foolish

11   decision.  I know I shouldn't have done it, but I done it,

12   because I thought it would make me feel better.  When I took

13   the ecstasy pill, I thought it would make me feel better, but

14   it did the opposite.  I was told it would make me happy, but

15   it didn't.

16          I'm deeply sorry for what I've done to these

17   people and what I did to the community.  Again, I make no

18   excuses and I take full responsibility.

19          THE COURT:  Thank you, Mr. Randell.

20   Mr. Prengaman.

21          MR. PRENGAMAN:  Thank you, your Honor.  I'd like

22   to first, Francisco, do you still wish to address the Court?

23          THE VICTIM ADVOCATE:  I'm all right.  I heard what

24   I wanted to hear.

1          MR. PRENGAMAN:  Your Honor, I call Krystal S.

2          (One witness sworn at this time.)

3          THE COURT:  Mr. Prengaman.

4          MR. PRENGAMAN:  Thank you, your Honor.

5  BY MR. PRENGAMAN:

6     Q.    Krystal, could you spell your first name for the

7  record?

8     A.    It's K-r-y-s-t-a-l.

9     Q.    And the first initial of your last name is S?

10    A.    Yes.

11    Q.    And you are one of the victims in this case?

12    A.    Yes.

13    Q.    Do you have a statement that you would like to

14  make to the Court about the impact that the crimes in this

15  case have had on you?

16    A.    Yes.

17    Q.    Go ahead.

18    A.    All right.  The impact that this has made on my

19  life is very negative.  At first when the situation happened,

20  I didn't know exactly how to take it until later on, time

21  just kept moving, passing is when I started to realize

22  exactly what happened to me.

23          That's basically when I started to victimize

24  myself and just be really dark about everything.  I would

47

1    blame myself for everything.  I would be in a very dark

2    place, just very depressed, not wanting to really do anything

3    or to talk to anybody.  I just wanted to be alone.  It was a

4    really hard time.  Luckily, I had family members to help me,

5    especially my mom, who is my backbone.

6             From this experience, I know I have grown a lot.

7    I know I still need a lot of work, but it just shows me to

8    not victimize myself and just to keep moving forward with

9    life and not let this stop me from succeeding.

10            Yeah, it's been a really hard time.  It's been

11   very negative and dark and I would just like to put this

12   behind me.  I think I'm done.

13            MR. PRENGAMAN:  Okay.  Thank you, Krystal.  Your

14   Honor, the other victims, they do not wish to speak, so that

15   will conclude the State's presentation.

16            THE COURT:  Thank you, Mr. Prengaman.

17            A judge has to take lot of factors into

18   consideration in determining what the appropriate sentence is

19   for each case.  Every defendant is different.  Every crime is

20   different.  Every victim is different.

21            The Court has to take into consideration the

22   defendant, the defendant's age, education, military service,

23   employment, ties to the community, mental, physical health.

24            The Court has to take into consideration the

1    victim.    The Court always to consider the victim.

2                 The Court has to take into consideration the

3    crime, the impact the crime has had on the victim, the impact

4    the crime has had on the community, the type of crime.

5                 The Court has to take into consideration the goals

6    of punishment, that is, isolation, rehabilitation,

7    deterrence, both specific, that is, shaping a sentence that

8    would deter the individual from committing the crime again,

9    and general deterrence, that is, if somebody picked up the

10   newspaper tomorrow and they saw what happened here today,

11   they would be deterred from engaging in the same conduct.

12               This Court has considered Mr. Randell's

13   background.    This is not the first time Mr. Randell has been

14   in front of this Court.    This Court is familiar with his

15   tragic childhood, background.    The Court had given Mr.

16   Randell several breaks, regimental discipline as opposed to

17   prison, Mental Health Court as opposed to prison.    The Court

18   has considered his youth and criminal history.

19               The Court has considered the victims in this case.

20   These are truly innocent victims.    A couple were returning

21   from the store, only to have a strange person with a

22   semi-automatic assault type weapon rush them right outside

23   their door.

24               The Court is impressed with the bravery exhibited

1  by the victims in this case in trying to stop the assault,

2  trying to block the door from this assailant, who not only

3  displays the gun, but discharges it into an apartment

4  complex.

5          This Court has considered the victim, the father

6  who to lived through something no father should ever have to

7  live through, the rape of his daughter.

8          The Court has considered the victim in this case,

9  Krystal, and the Court is very impressed with her inner

10 strength and the resilience that she has shown in recovering

11 from this.  She is not a victim.  She is a victor.  She has

12 and she will prevail.  And we are lucky to still have her

13 amongst us.  In fact, we're lucky to have all of them still

14 amongst us.

15         Except for the best efforts of this defendant,

16 they could be dead, could have been shot, as Mr. Randell

17 demonstrated.  Could have been strangled, as Mr. Randell

18 demonstrated.  Could have been burned alive, as Mr. Randell

19 attempted.  This is truly a triumph of good over evil.

20         The Court has taken into consideration the crimes.

21 But for some divine intervention, we have an attempted

22 murder, not a murder.  But for that, there could be no more

23 heinous, barbaric, inhumane crimes against the person than

24 attempted murder, sexual assault, kidnapping with the use of

1   a deadly weapon.  Not just any weapon, this weapon was

2   described as an assault type weapon with an extended magazine

3   and a suppressor, a silencer.

4        The Court has taken into consideration the goals

5   of punishment.  Isolation, that applies in this case.  Mr.

6   Randell has forfeited his right to walk among lawful,

7   peaceful citizens.

8        Rehabilitation, perhaps there might be some

9   glimmer of hope for Mr. Randell through the intervention of

10  psychological services, psychotropic medication, perhaps.

11  But we shouldn't wait for such an outcome before we impose

12  our judgment upon him.

13       Specific and general deterrence, that applies in

14  this case as well.  What Mr. Randell sought to accomplish

15  here is beyond the pale, beyond just ripping a necklace from

16  the neck of a 16-year-old girl.  For what?  What he tried to

17  accomplish here is murder, plain and simple, and in as many

18  ways as possible, through the use of a firearm, arson, and

19  manual strangling someone until their eyes pop with blood.

20       These crimes against these victims deserve the

21  maximum sentence.  People think judges are powerful.  It's

22  cases like this that haunt them, make me appreciate what

23  little power I have.  I cannot restore to the young child her

24  sense of innocence.  I cannot restore to her father, her

1   mother a sense of security.  I cannot turn back the hands of

2   time.  And while I can't change the past, I can shape the

3   future, and that's just what I'm going to do here now.

4          Mr. Randell, Ms. Clerk, it will be the order of

5   the Court, the defendant is to pay a $25 administrative

6   assessment fee, $3 genetic marking, $500 attorney's fees.

7          As to Count One, attempted murder with the use of

8   a deadly weapon, pursuant to NRS 193.163, this Court has

9   considered the following factors in determining the length of

10  the additional criminal penalty.  This Court has considered

11  the facts and circumstances of the crime, which is heinous,

12  the criminal history of the defendant, which is moderate, the

13  impact of the crime on the victims, which is great, the

14  mitigating factors presented by the Mr. Randell and all other

15  relevant information.

16          Therefore, as to Count One, attempted murder with

17  a deadly weapon, the defendant is sentenced to the custody of

18  the Nevada Department of Corrections for a term of

19  imprisonment of 96 to 240 months.  Consecutive to that

20  sentence, for the deadly weapon, a consecutive 96 to

21  240 months.  Restitution in the amount of $2,525.08.

22          As to Count Two, sexual assault with a deadly

23  weapon, the Court adopts the previous findings pursuant to

24  NRS 193.169.  The defendant is sentenced to the custody of

1  the Nevada Department of Corrections for a term of

2  imprisonment of life in prison without the possibility of

3  parole.  That is consecutive to a deadly weapon enhancement

4  of 96 to 240 months.

5            As to Count Three, sexual assault with a deadly

6  weapon, the defendant is sentenced to the custody of the

7  Nevada Department of Corrections for a term of imprisonment

8  of life without the possibility of parole.  Consecutive to

9  that, pursuant to NRS 193.169, an enhanced penalty of 96 to

10  240 months for the deadly weapon enhancement.

11            As to Count Four, kidnapping in the first degree

12  with the use of a deadly weapon with substantial bodily harm,

13  the Court adopts the findings previously made pursuant to NRS

14  193.169, and the defendant is sentenced to the custody of the

15  Nevada Department of Corrections for a term of imprisonment

16  of life without the possibility of parole with a consecutive

17  enhanced sentence of 96 to 240 months for the deadly weapon

18  enhancement.

19            Finally, as to Count Five, robbery with the use of

20  a deadly weapon, the Court adopts the previous findings made

21  pursuant to NRS 193.169 and sentences the defendant to the

22  custody of the Nevada Department of Corrections for a term of

23  imprisonment of 84 to 180 months with a consecutive 84 to

24  180 months for the deadly weapon consecutive enhancements.

1          Count Five is to run consecutive to Count Four,

2     Count Four is to run consecutive to Count Three, Count Three

3     is to run consecutive to Count Two, and Count Two is to run

4     consecutive to Count One.

5          The defendant is given 350 days credit for time

6     served.

7          MS. BROWN:  Your Honor --

8          THE COURT:  The sentences will be aggregated,

9     Ms. Brown.

10          MS. BROWN:  I'm sorry, your Honor.  And also since

11    credit for time served is 350 days.  I'm assuming you are

12    making Count One consecutive or this case consecutive to

13    CR12-1469.

14          THE COURT:  I will.  That will be the order of the

15    Court.

16                        --oOo--

17

18

19

20

21

22

23

24

```
1   STATE OF NEVADA      )
                          ) ss.
2   County of Washoe     )

3       I, STEPHANIE KOETTING, a Certified Court Reporter of the

4   Second Judicial District Court of the State of Nevada, in and

5   for the County of Washoe, do hereby certify;

6       That I was present in Department No. 7 of the

7   above-entitled Court on December 22, 2016, at the hour of

8   9:00 a.m., and took verbatim stenotype notes of the

9   proceedings had upon the sentencing in the matter of THE

10  STATE OF NEVADA, Plaintiff, vs. TIMOTHY RANDELL, Defendant,

11  Case No. CR15-1360, and thereafter, by means of

12  computer-aided transcription, transcribed them into

13  typewriting as herein appears;

14      That the foregoing transcript, consisting of pages 1

15  through 55, both inclusive, contains a full, true and

16  complete transcript of my said stenotype notes, and is a

17  full, true and correct record of the proceedings had at said

18  time and place.

19

20   DATED:  At Reno, Nevada, this 20th day of April 2017.

21

22                         S/s Stephanie Koetting
                           STEPHANIE KOETTING, CCR #207
23

24
```